# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 5, 2005 Decided December 6, 2005

No. 04-5257

AMERICAN BAR ASSOCIATION,
APPELLEE

v.

FEDERAL TRADE COMMISSION,
APPELLANT

———

Consolidated with
04-5258

———

Appeals from the United States District Court
for the District of Columbia
(No. 02cv00810)
(No. 02cv01883)

———

*Stephanie R. Marcus*, Attorney, U.S. Department of Justice, argued the cause for appellant. With her on the briefs were *Gregory G. Katsas*, Acting Assistant Attorney General, *Mark B. Stern*, Attorney, *Kenneth L. Wainstein*, U.S. Attorney, *Brian J. Sonfield*, Assistant U.S. Attorney, *John D. Graubert*, Acting General Counsel, Federal Trade Commission, *John F. Daly*, Deputy General Counsel, and *Michael D. Bergman*, Attorney. *R. Craig Lawrence* and *Michael J. Ryan*, Assistant U.S. Attorneys, entered appearances.

2

*David L. Roll* argued the cause for appellee American Bar Association. With him on the brief was *Rhonda M. Bolton*.

*Steven C. Krane* argued the cause and filed the brief for appellee New York State Bar Association.

*Peter Buscemi* was on the brief for *amici curiae* State and Local Bar Associations in support of appellees.

*George T. Patton, Jr. and Bryan H. Babb* were on the brief for *amicus curiae* The Conference of Chief Justices in support of appellee American Bar Association.

Before: GINSBURG, *Chief Judge*, and SENTELLE and ROBERTS,[1] *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: The Federal Trade Commission ("FTC" or "the Commission") appeals from an order of the District Court granting summary judgment in consolidated cases brought by the appellees American Bar Association and the New York State Bar Association (collectively, "ABA" or "the Bar Associations"). The Bar Associations sought a declaratory judgment that the FTC's decision that attorneys engaged in the practice of law are covered by the Gramm-Leach-Bliley Act ("GLBA" or "the Act") exceeded the statutory authority of the Commission and was therefore invalid as a matter of law. Because we agree with the District Court that the Commission's attempt to regulate the practice of law under the Act fell outside its statutory authority, we affirm the judgment under review.

---

[1]Then Judge, now Chief Justice, Roberts was a member of the panel that originally heard this appeal. He is now recused and took no part in the final decision.

## I. Background

A. *Statutory Framework*

Effective November 12, 1999, Congress enacted the Gramm-Leach-Bliley Financial Modernization Act, Pub. L. No. 106-102, 113 Stat. 1338. The Act declared it to be "the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a). To further that goal, Congress enacted broad privacy protective provisions, described by one Member of the House of Representatives as "represent[ing] the most comprehensive federal privacy protections ever enacted by Congress." 145 Cong. Rec. H11, 544 (daily ed. Nov. 4, 1999) (statement of Rep. Sandlin).

The privacy provisions empowered the Federal Trade Commission, along with other federal regulatory agencies, to "prescribe . . . such regulations as may be necessary to carry out the purposes of this subchapter with respect to the financial institutions subject to their jurisdiction under section 6805 of this title." 15 U.S.C. § 6804(a)(1). The cited section, 6805, outlines the institutions and persons subject to the jurisdiction of "Federal functional regulators," and in section 6805(a)(7) assigns enforcement "[u]nder the Federal Trade Commission Act . . . [to] the Federal Trade Commission for any other financial institution or other person that is not subject to the jurisdiction of any agency or authority under" the preceding paragraphs of the subsection. The definitional section of the statute, section 6809, defines "financial institution" as "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12." *Id*. § 6809(3)(A). Other subsections of section 6809 create

exceptions and modifications to the general definition of "financial institution." *See id.* § 6809(3)(B)-(D).

Title 12 U.S.C. § 1843(k), referenced in section 6809(a), is a part of the Bank Holding Company Act of 1956, Pub. L. No. 109-41, 70 Stat. 133 (codified as amended at 12 U.S.C. §§ 1971-1978, 1841-1850) ("BHCA"). The BHCA, in section 1843, limits the ability of the bank holding companies regulated under that statutory scheme to hold interests in nonbanking organizations. Specifically, section 1843(a) provides that

> [e]xcept as otherwise provided in this chapter, no bank holding company shall . . . retain direct or indirect ownership or control of any voting shares of any company which is not a bank or bank holding company or engage in any activities other than (A) those of banking or of managing or controlling banks and other subsidiaries authorized under this chapter or of furnishing services to or performing services for its subsidiaries, and (B) those permitted under [other subsections of the statute].[2]

12 U.S.C. § 1843(a). However, section 1843(k) limits the effect of the general prohibition created by section 1843(a) by providing that

> [n]otwithstanding subsection (a) of this section, a financial holding company may engage in any activity, and may acquire and retain the shares of any company engaged in any activity, that the [Federal Reserve] Board . . . determines (by regulation or order)-- (A) to be financial in nature or incidental to such financial activity; or (B) is complementary to a financial activity and does not pose a

---

[2]Section 1843(a) provides other exceptions and limitations not pertinent to the present controversy.

substantial risk to the safety or soundness of depository institutions or the financial system generally.

*Id.* § 1843(k)(1).

The BHCA declares to be financial in nature activities listed in section 1843(k)(4), to wit:

> (A) Lending, exchanging, transferring, investing for others, or safeguarding money or securities.

> (B) Insuring, guaranteeing, or indemnifying against loss, harm, damage, illness, disability, or death, or providing and issuing annuities, and acting as principal, agent, or broker for purposes of the foregoing, in any State.

> (C) Providing financial, investment, or economic advisory services, including advising an investment company (as defined in [section 80a-3 of Title 15]).

> (D) Issuing or selling instruments representing interests in pools of assets permissible for a bank to hold directly.

> (E) Underwriting, dealing in, or making a market in securities.

*Id.* § 1843(k)(4).

Following the list of activities that "shall be considered" financial in nature, the BHCA enacted the following category of activity, which is most pertinent to the current case:

> (F) Engaging in any activity that the Board has determined, by order or regulation that is in effect on November 12, 1999, to be so closely related to banking or

managing or controlling banks as to be a proper incident thereto (subject to the same terms and conditions contained in such order or regulation, unless modified by the [Federal Reserve] Board).

The phrase "order or regulation that is in effect on November 12, 1999" adopts a Federal Reserve Board ("Board") regulation published at 12 C.F.R. § 225.28 (2000), commonly known as Regulation Y. Regulation Y, as is to be expected, deals with the subject matter of section 1843(k), that is, "nonbanking activities and acquisitions by bank holding companies": It lists "permissible nonbanking activities." That list is described in the regulation as activities that are

> (a) Closely related nonbanking activities. The activities listed in paragraph (b) of this section are so closely related to banking or managing or controlling banks as to be a proper incident thereto, and may be engaged in by a bank holding company or its subsidiary in accordance with the requirements of this regulation.

12 C.F.R. § 225.28(a). We set forth the entire text of the relevant subsection in the footnote below not because it is all in itself relevant, but in order to demonstrate the depths plumbed by the Commission in order to find authority to undertake the regulation of the practice of law, which we will discuss further, *infra*.[3]

---

[3]In paragraph (b), referenced above, Regulation Y sets forth the following list:

> (1) Extending credit and servicing loans. Making, acquiring, brokering, or servicing loans or other extensions of credit (including factoring, issuing letters of credit and accepting drafts) for the company's account or for the account

of others.

(2) Activities related to extending credit. Any activity usual in connection with making, acquiring, brokering or servicing loans or other extensions of credit, as determined by the Board. The Board has determined that the following activities are usual in connection with making, acquiring, brokering, or servicing loans or other extensions of credit:

(i) Real estate and personal property appraising. Performing appraisals of real estate and tangible and intangible personal property, including securities.

(ii) Arranging commercial real estate equity financing. Acting as intermediary for the financing of commercial or industrial income-producing real estate by arranging for the transfer of the title, control, and risk of such a real estate project to one or more investors, if the bank holding company and its affiliates do not have an interest in, or participate in managing or developing, a real estate project for which it arranges equity financing, and do not promote or sponsor the development of the property.

(iii) Check-guaranty services. Authorizing a subscribing merchant to accept personal checks tendered by the merchant's customers in payment for goods and services, and purchasing from the merchant validly authorized checks that are subsequently dishonored.

(iv) Collection agency services. Collecting overdue accounts receivable, either retail or commercial.

(v) Credit bureau services. Maintaining information related to the credit history of consumers and providing the information to a credit grantor who is considering a borrower's application for credit or who has extended credit to the borrower.

(vi) Asset management, servicing, and collection activities. Engaging under contract with a third party in asset management, servicing, and collection of assets of a type that an insured depository institution may originate and own, if the company does not engage in real property management or real estate brokerage services as part of these services.

(vii) Acquiring debt in default. Acquiring debt that is in default at the time of acquisition, if the company:

(A) Divests shares or assets securing debt in default that are not permissible investments for bank holding companies, within the time period required for divestiture of property acquired in satisfaction of a debt previously contracted under § 225.12(b);

(B) Stands only in the position of a creditor and does not purchase equity of obligors of debt in default (other than equity that may be collateral for such debt); and

(C) Does not acquire debt in default secured by shares of a bank or bank holding company.

(viii) Real estate settlement servicing. Providing real estate settlement services.

(3) Leasing personal or real property. Leasing personal or real property or acting as agent, broker, or adviser in leasing such property if:

(i) The lease is on a nonoperating basis;

(ii) The initial term of the lease is at least 90 days;

(iii) In the case of leases involving real property:

(A) At the inception of the initial lease, the effect of

the transaction will yield a return that will compensate the lessor for not less than the lessor's full investment in the property plus the estimated total cost of financing the property over the term of the lease from rental payments, estimated tax benefits, and the estimated residual value of the property at the expiration of the initial lease; and

(B) The estimated residual value of property for purposes of paragraph (b)(3)(iii)(A) of this section shall not exceed 25 percent of the acquisition cost of the property to the lessor.

(4) Operating nonbank depository institutions–

(i) Industrial banking. Owning, controlling, or operating an industrial bank, Morris Plan bank, or industrial loan company, so long as the institution is not a bank.

(ii) Operating savings association. Owning, controlling, or operating a savings association, if the savings association engages only in deposit-taking activities, lending, and other activities that are permissible for bank holding companies under this subpart C.

(5) Trust company functions. Performing functions or activities that may be performed by a trust company (including activities of a fiduciary, agency, or custodial nature), in the manner authorized by federal or state law, so long as the company is not a bank for purposes of section 2(c) of the Bank Holding Company Act.

(6) Financial and investment advisory activities. Acting as investment or financial advisor to any person, including (without, in any way, limiting the foregoing):

(i) Serving as investment adviser (as defined in section 2(a)(20) of the Investment Company Act of 1940, 15

U.S.C. 80a-2(a)(20)), to an investment company registered under that act, including sponsoring, organizing, and managing a closed-end investment company;

(ii) Furnishing general economic information and advice, general economic statistical forecasting services, and industry studies;

(iii) Providing advice in connection with mergers, acquisitions, divestitures, investments, joint ventures, leveraged buyouts, recapitalizations, capital structurings, financing transactions and similar transactions, and conducting financial feasibility studies;

(iv) Providing information, statistical forecasting, and advice with respect to any transaction in foreign exchange, swaps, and similar transactions, commodities, and any forward contract, option, future, option on a future, and similar instruments;

(v) Providing educational courses, and instructional materials to consumers on individual financial management matters; and

(vi) Providing tax-planning and tax-preparation services to any person.

(7) Agency transactional services for customer investments–

(i) Securities brokerage. Providing securities brokerage services (including securities clearing and/or securities execution services on an exchange), whether alone or in combination with investment advisory services, and incidental activities (including related securities credit activities and custodial services), if the securities brokerage services are restricted to buying and selling securities solely

as agent for the account of customers and do not include securities underwriting or dealing.

(ii) Riskless principal transactions. Buying and selling in the secondary market all types of securities on the order of customers as a "riskless principal" to the extent of engaging in a transaction in which the company, after receiving an order to buy (or sell) a security from a customer, purchases (or sells) the security for its own account to offset a contemporaneous sale to (or purchase from) the customer. This does not include:

(A) Selling bank-ineligible securities at the order of a customer that is the issuer of the securities, or selling bank-ineligible securities in any transaction where the company has a contractual agreement to place the securities as agent of the issuer; or

(B) Acting as a riskless principal in any transaction involving a bank-ineligible security for which the company or any of its affiliates acts as underwriter (during the period of the underwriting or for 30 days thereafter) or dealer.

(iii) Private placement services. Acting as agent for the private placement of securities in accordance with the requirements of the Securities Act of 1933 (1933 Act) and the rules of the Securities and Exchange Commission, if the company engaged in the activity does not purchase or repurchase for its own account the securities being placed, or hold in inventory unsold portions of issues of these securities.

(iv) Futures commission merchant. Acting as a futures commission merchant (FCM) for unaffiliated persons in the execution, clearance, or execution and clearance of any futures contract and option on a futures contract traded on an exchange in the United States or abroad if:

(A) The activity is conducted through a separately incorporated subsidiary of the bank holding company, which may engage in activities other than FCM activities (including, but not limited to, permissible advisory and trading activities); and

(B) The parent bank holding company does not provide a guarantee or otherwise become liable to the exchange or clearing association other than for those trades conducted by the subsidiary for its own account or for the account of any affiliate.

(v) Other transactional services. Providing to customers as agent transactional services with respect to swaps and similar transactions, any transaction described in paragraph (b)(8) of this section, any transaction that is permissible for a state member bank, and any other transaction involving a forward contract, option, futures, option on a futures or similar contract (whether traded on an exchange or not) relating to a commodity that is traded on an exchange.

(8) Investment transactions as principal–

(i) Underwriting and dealing in government obligations and money market instruments. Underwriting and dealing in obligations of the United States, general obligations of states and their political subdivisions, and other obligations that state member banks of the Federal Reserve System may be authorized to underwrite and deal in under 12 U.S.C. 24 and 335, including banker's acceptances and certificates of deposit, under the same limitations as would be applicable if the activity were performed by the bank holding company's subsidiary member banks or its subsidiary nonmember banks as if they were member banks.

(ii) Investing and trading activities. Engaging as

principal in:

(A) Foreign exchange;

(B) Forward contracts, options, futures, options on futures, swaps, and similar contracts, whether traded on exchanges or not, based on any rate, price, financial asset (including gold, silver, platinum, palladium, copper, or any other metal approved by the Board), nonfinancial asset, or group of assets, other than a bank-ineligible security, if:

(1) A state member bank is authorized to invest in the asset underlying the contract;

(2) The contract requires cash settlement; or

(3) The contract allows for assignment, termination, or offset prior to delivery or expiration, and the company makes every reasonable effort to avoid taking or making delivery; and

(C) Forward contracts, options, futures, options on futures, swaps, and similar contracts, whether traded on exchanges or not, based on an index of a rate, a price, or the value of any financial asset, nonfinancial asset, or group of assets, if the contract requires cash settlement.

(iii) Buying and selling bullion, and related activities. Buying, selling and storing bars, rounds, bullion, and coins of gold, silver, platinum, palladium, copper, and any other metal approved by the Board, for the company's own account and the account of others, and providing incidental services such as arranging for storage, safe custody, assaying, and shipment.

(9) Management consulting and counseling activities–

(i) Management consulting.

(A) Providing management consulting advice:

(1) On any matter to unaffiliated depository institutions, including commercial banks, savings and loan associations, savings banks, credit unions, industrial banks, Morris Plan banks, cooperative banks, industrial loan companies, trust companies, and branches or agencies of foreign banks;

(2) On any financial, economic, accounting, or audit matter to any other company.

(B) A company conducting management consulting activities under this subparagraph and any affiliate of such company may not:

(1) Own or control, directly or indirectly, more than 5 percent of the voting securities of the client institution; and

(2) Allow a management official, as defined in 12 CFR 212.2(h), of the company or any of its affiliates to serve as a management official of the client institution, except where such interlocking relationship is permitted pursuant to an exemption granted under 12 CFR 212.4(b) or otherwise permitted by the Board.

(C) A company conducting management consulting activities may provide management consulting services to customers not described in paragraph (b)(9)(i)(A)(1) of this section or regarding matters not described in paragraph (b)(9)(i)(A)(2) of this section, if the total annual revenue derived from those management consulting services does not exceed 30 percent of the company's total annual revenue derived from management consulting activities.

(ii) Employee benefits consulting services. Providing consulting services to employee benefit, compensation and

insurance plans, including designing plans, assisting in the implementation of plans, providing administrative services to plans, and developing employee communication programs for plans.

(iii) Career counseling services. Providing career counseling services to:

(A) A financial organization and individuals currently employed by, or recently displaced from, a financial organization;

(B) Individuals who are seeking employment at a financial organization; and

(C) Individuals who are currently employed in or who seek positions in the finance, accounting, and audit departments of any company.

(10) Support services–

(i) Courier services. Providing courier services for:

(A) Checks, commercial papers, documents, and written instruments (excluding currency or bearer-type negotiable instruments) that are exchanged among banks and financial institutions; and

(B) Audit and accounting media of a banking or financial nature and other business records and documents used in processing such media.

(ii) Printing and selling MICR-encoded items. Printing and selling checks and related documents, including corporate image checks, cash tickets, voucher checks, deposit slips, savings withdrawal packages, and other forms that require Magnetic Ink Character Recognition (MICR)

encoding.

(11) Insurance agency and underwriting–

(i) Credit insurance. Acting as principal, agent, or broker for insurance (including home mortgage redemption insurance) that is:

(A) Directly related to an extension of credit by the bank holding company or any of its subsidiaries; and

(B) Limited to ensuring the repayment of the outstanding balance due on the extension of credit in the event of the death, disability, or involuntary unemployment of the debtor.

(ii) Finance company subsidiary. Acting as agent or broker for insurance directly related to an extension of credit by a finance company that is a subsidiary of a bank holding company, if:

(A) The insurance is limited to ensuring repayment of the outstanding balance on such extension of credit in the event of loss or damage to any property used as collateral for the extension of credit; and

(B) The extension of credit is not more than $10,000, or $25,000 if it is to finance the purchase of a residential manufactured home and the credit is secured by the home; and

(C) The applicant commits to notify borrowers in writing that:

(1) They are not required to purchase such insurance from the applicant;

(2) Such insurance does not insure any interest of the borrower in the collateral; and

(3) The applicant will accept more comprehensive property insurance in place of such single-interest insurance.

(iii) Insurance in small towns. Engaging in any insurance agency activity in a place where the bank holding company or a subsidiary of the bank holding company has a lending office and that:

(A) Has a population not exceeding 5,000 (as shown in the preceding decennial census); or

(B) Has inadequate insurance agency facilities, as determined by the Board, after notice and opportunity for hearing.

(iv) Insurance-agency activities conducted on May 1, 1982. Engaging in any specific insurance-agency activity if the bank holding company, or subsidiary conducting the specific activity, conducted such activity on May 1, 1982, or received Board approval to conduct such activity on or before May 1, 1982. A bank holding company or subsidiary engaging in a specific insurance agency activity under this clause may:

(A) Engage in such specific insurance agency activity only at locations:

(1) In the state in which the bank holding company has its principal place of business (as defined in 12 U.S.C. 1842(d));

(2) In any state or states immediately adjacent to such state; and

(3) In any state in which the specific insurance-agency activity was conducted (or was approved to be conducted) by such bank holding company or subsidiary thereof or by any other subsidiary of such bank holding company on May 1, 1982; and

(B) Provide other insurance coverages that may become available after May 1, 1982, so long as those coverages insure against the types of risks as (or are otherwise functionally equivalent to) coverages sold or approved to be sold on May 1, 1982, by the bank holding company or subsidiary.

(v) Supervision of retail insurance agents. Supervising on behalf of insurance underwriters the activities of retail insurance agents who sell:

(A) Fidelity insurance and property and casualty insurance on the real and personal property used in the operations of the bank holding company or its subsidiaries; and

(B) Group insurance that protects the employees of the bank holding company or its subsidiaries.

(vi) Small bank holding companies. Engaging in any insurance-agency activity if the bank holding company has total consolidated assets of $50 million or less. A bank holding company performing insurance-agency activities under this paragraph may not engage in the sale of life insurance or annuities except as provided in paragraphs (b)(11)(i) and (iii) of this section, and it may not continue to engage in insurance-agency activities pursuant to this provision more than 90 days after the end of the quarterly reporting period in which total assets of the holding company and its subsidiaries exceed $50 million.

(vii) Insurance-agency activities conducted before 1971.  Engaging in any insurance-agency activity performed at any location in the United States directly or indirectly by a bank holding company that was engaged in insurance-agency activities prior to January 1, 1971, as a consequence of approval by the Board prior to January 1, 1971.

(12) Community development activities–

(i) Financing and investment activities.  Making equity and debt investments in corporations or projects designed primarily to promote community welfare, such as the economic rehabilitation and development of low-income areas by providing housing, services, or jobs for residents.

(ii) Advisory activities.  Providing advisory and related services for programs designed primarily to promote community welfare.

(13) Money orders, savings bonds, and traveler's checks.  The issuance and sale at retail of money orders and similar consumer-type payment instruments; the sale of U.S. savings bonds; and the issuance and sale of traveler's checks.

(14) Data processing.

(i) Providing data processing and data transmission services, facilities (including data processing and data transmission hardware, software, documentation, or operating personnel), data bases, advice, and access to such services, facilities, or data bases by any technological means, if:

(A) The data to be processed or furnished are financial, banking, or economic; and

(B) The hardware provided in connection therewith is offered only in conjunction with software designed and

To recapitulate: The GLBA contains extensive privacy protection provisions that apply to "financial institutions." In section 6809, the Act defines "financial institution" as "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12." The referenced section of Title 12 is contained in the BHCA. Specifically, that section identifies institutions engaged in nonbanking activities that are financial in nature, such that bank holding companies may retain ownership interests in institutions engaged in their pursuit. The section of the BHCA defining those activities incorporates by reference Regulation Y, which offers an extensive list of examples of such "financial activities" so closely related to banking as to be permissible.

B. *The Commission's Interpretation*

Upon the passage of the Act, the FTC, pursuant to the

---

marketed for the processing and transmission of financial, banking, or economic data, and where the general purpose hardware does not constitute more than 30 percent of the cost of any packaged offering.

(ii) A company conducting data processing and data transmission activities may conduct data processing and data transmission activities not described in paragraph (b)(14)(i) of this section if the total annual revenue derived from those activities does not exceed 30 percent of the company's total annual revenues derived from data processing and data transmission activities.

12 C.F.R. § 225.28(b) (2001) (footnotes omitted).

authority granted it in 15 U.S.C. § 6805(a)(7), undertook a rulemaking. In May 2000, the FTC concluded the rulemaking and issued regulations published at 65 Fed. Reg. 33,646 (codified at 16 C.F.R. pt. 313). Although the FTC relied in the first instance on Congress's definition of "financial institution" as "an institution the business of which is engaging in financial activities," the Commission restated the definition: "An institution that is significantly engaged in financial activities is a financial institution." 16 C.F.R. § 313.3(k)(1).

Like the statute, the regulations at no point describe the statutory or regulatory scheme as governing the practice of law as such. Indeed, the phrase "practice of law" never appears in part 313, and the word "attorneys," while present in two places, appears in the context of describing persons to whom financial institutions can make release of customer information, if authorized, not in the context of defining "financial institutions" as including attorneys. Nonetheless, the breadth of the FTC's regulation, apparently taken in conjunction with statements to or by news media, caused concern among representatives of the bar. Therefore, various bar associations, including the American Bar Association, made inquiry of the Commission as to whether the Commission was taking a position that privacy provisions of the GLBA and the regulations made pursuant thereto governed attorneys engaged in the practice of law.

On April 8, 2002, the Director of the Bureau of Consumer Protection at the Commission sent a letter to the President and the Director of Governmental Affairs of the ABA "in response to your correspondence regarding the application of Title V, Subtitle A, of the Gramm-Leach-Bliley Act, 15 U.S.C. 6801 *et seq*. . . . and the Federal Trade Commission's Rule, Privacy of Consumer Financial Information . . . to attorneys at law." (Citations omitted.) As part of the inquiry, the ABA had also requested exemption from the Act if the Commission purported

to regulate the practice of law under the Act. That position has been abandoned by the bar associations during the course of this litigation, but was still a live question between the parties at the time of the FTC's communication to the ABA. Although recognizing that the bar associations' letters had "question[ed] the appropriateness and utility of applying the GLB Act's privacy provisions to attorneys engaged in the practice of law," the Director only directly addressed the ABA's request for exemption. However, in rejecting that request, the Director made it plain that the Commission was purporting to regulate attorneys engaged in the practice of their profession and asserted that "the GLB Act itself states that *entities* engaged in 'financial activities' are subject to the Act." (emphasis supplied).

After some further negotiation, the bar associations brought the present litigation.

## II.  The Litigation

The New York State Bar Association and the American Bar Association separately filed actions for declaratory judgment. While the prayers for relief in the two complaints are differently worded, the gist is the same, in that each seeks, *inter alia*, a declaratory order that, in the words of the ABA complaint:

> (a) Congress did not in the GLBA confer authority on the FTC to regulate the confidentiality, privacy and security of information disclosed by clients to their attorneys;

> (b) The FTC's decision that attorneys engaged in the practice of law are covered by the GLBA is unlawful and hereby set aside; . . . .

Although the district judge never formally ordered the two actions consolidated, he dealt with them together and ultimately

disposed of them in a single opinion and order. The FTC moved to dismiss the actions under Federal Rule of Civil Procedure 12(b)(6), on the theory that the complaints failed to state a claim for relief. The District Court denied the motion. *N.Y. State Bar Ass'n v. FTC*, 276 F. Supp. 2d 110 (D.D.C. 2003). In that opinion, the court reasoned that Congress did not intend GLBA's privacy provisions to apply to attorneys. Further, the court reasoned, even if the GLBA were ambiguous on that point, the court should not defer to the FTC's interpretation applying the Act to attorneys because the interpretation was not the product of notice and comment rulemaking, did not appear to have been made with any degree of deliberation, and was supported only by *post hoc* rationalization. The court held that the Commission's attempt to regulate attorneys under the privacy provisions of the GLBA was not only inconsistent with the statute, but also arbitrary and capricious in violation of the Administrative Procedure Act.

After the denial of the motion to dismiss, the parties proceeded with cross-motions for summary judgment. The District Court found no genuine issues as to any material fact and, incorporating its earlier decision on the motion to dismiss, again held that Congress in 5 U.S.C. § 706(2)(C) did not intend the GLBA's privacy provisions to apply to attorneys engaged in the practice of law.

The current appeal followed.

## III.  Analysis

As we analyze the FTC's arguments for the proposition that Congress in the privacy provisions of the GLBA enabled the Commission to regulate the practice of law, we are reminded repeatedly of a recent admonition from the Supreme Court: "[Congress] does not . . . hide elephants in mouseholes."

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The FTC begins its defense of its attempted turf expansion in the correct place, that is, by recognizing that "the starting point in any case involving the meaning of a statute[] is the language of the statute itself." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 210 (1979). The Commission argues, as it did before the District Court, that the language of the statute evidences a congressional intent to empower the Commission to regulate attorneys engaged in certain types of law practice as "financial institutions" under the privacy regulations promulgated pursuant to the GLBA privacy provisions. More specifically, the Commission notes that the legislation defines "financial institution" quite broadly as "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12." The statute in turn deems as "financial in nature" various listed activities, together with those not expressly listed but theretofore listed by the Federal Reserve Board in Regulation Y. Regulation Y, set forth at its staggering full-length above, includes the activities "[p]roviding real estate settlement services," and "[p]roviding tax-planning and tax-preparation services to any person." 12 C.F.R. § 225.28(b)(2)(viii), (b)(6)(vi) (2001). The Commission then asserts, "[t]hus, under the terms of the statute, any institution that is in the business of engaging in a financial activity listed in section 4(k) of the BHCA, including those set forth in Regulation Y, qualifies as a 'financial institution.'" Appellant's Brief at 16. That statement by the Commission is unassailable: Indeed, it does no more than restate the provisions of that statute. That is precisely the problem. The Commission's reasoning, doing no more than restating the statute, leaves as open as ever the question of whether an attorney practicing law is an "institution engaging in the business of financial activities."

The statute certainly does not so plainly grant the Commission the authority to regulate attorneys engaged in the practice of law as to entitle the Commission to what is called a "*Chevron* One" disposition. That is, rather simply we cannot hold that Congress has directly and plainly granted the Commission the authority to regulate practicing attorneys as the Commission attempts. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Indeed, such professionals are subject to regulation under the words of the statute only if they are "institutions" and if they are "engaged in the business of financial activity." It is not plain at all to us that Congress has entered such a direct regulatory command by plain language of a statute, a lengthy statute incorporated by reference, and an even more lengthy and detailed regulation incorporated by reference in the second statute, none of which ever mentioned attorneys engaged in the practice of law. Therefore, if the Commission is to prevail, it must do so under a deferential standard of review. That is, to uphold the Commission's regulatory decision, we must conclude first that the words of the statute are ambiguous in such a way as to make the Commission's decision worthy of deference under the second step of *Chevron*. *Id.* at 843. If we so hold, we will then uphold the agency's interpretation of the ambiguous statute if that interpretation is "permissible," that is, if it is "reasonable." *Id.* at 845.

A. *Chevron* Step One

The first question, whether there is such an ambiguity, is for the court, and we owe the agency no deference on the existence of ambiguity. Deference to the agency's interpretation under *Chevron* is warranted only where "Congress has left a gap for the agency to fill pursuant to an express or implied 'delegation of authority to the agency.'" *Ry. Labor Exec. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc)

26

(internal citation omitted). The Commission argues along the line suggested by the scant reasoning in the letter announcing its decision. The opinion letter had directed its language principally toward the question of whether the Commission should "exempt attorneys at law from the application of the Privacy Rule." True, the Bar Association had requested such an exemption, but only as a conditional request if the Commission held in the first instance that the privacy provisions of the GLBA covered attorneys engaged in the practice of law, a proposition that the association resisted. The Commission's letter, while claiming that "[w]e have carefully considered your concerns, and recognize the issues you have raised regarding the application of the GLB Act to attorneys at law," addressed only the "significant questions as to the legal authority of the Commission to grant the exemption you request."

The Commission apparently assumed–without reasoning–that it could extend its regulatory authority over attorneys engaged in the practice of law with no other basis than the observation that the Act did not provide for an exemption. Before the District Court and before us, the Commission has persisted in this style of reasoning. While there is limited *post hoc* rationalization in the Commission's brief addressing the inclusion of attorneys in the definition of "financial institution," which we will discuss *infra*, the Commission repeatedly repairs to the position that no language in the statute exempts attorneys from regulation. That is not the question. As we have often cautioned, "[t]o suggest, as the [Commission] effectively does, that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power . . . is both flatly unfaithful to the principles of administrative law . . . and refuted by precedent." *Ry. Labor Exec. Ass'n*, 29 F.3d at 671 (emphasis in original). Plainly, if we were "to *presume* a delegation of power" from the absence of "an express *withholding* of such power, agencies would enjoy

virtually limitless hegemony . . . ." *Id.* (emphasis in original). Therefore, if there is the sort of ambiguity that supports an implicit congressional delegation of authority to the agency to make a deference-worthy interpretation of the statute, we must look elsewhere than the failure to negate regulation of attorneys. That failure does not advance the Commission's cause at all. Otherwise put, the question is not whether the statute permits exemption from regulation for attorneys, but whether it supports such regulation at all. We will defer to the agency's interpretation on that subject only if the statute "is silent or ambiguous with respect to the specific issue." *Barnhart v. Walton*, 535 U.S. 212, 218 (2002) (internal quotation marks and citation omitted).

We further recognize that the existence of ambiguity is not enough per se to warrant deference to the agency's interpretation. The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity. "Mere ambiguity in a statute is not evidence of congressional delegation of authority." *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001) (citations omitted). The deference mandated in *Chevron* "comes into play, of course, only as a consequence of statutory ambiguity, and then *only* if the reviewing court finds an implicit delegation of authority to the agency." *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998) (emphasis added). When we examine a scheme of the length, detail, and intricacy of the one before us, we find it difficult to believe that Congress, by any remaining ambiguity, intended to undertake the regulation of the profession of law–a profession never before regulated by "federal functional regulators"–and never mentioned in the statute. To find this interpretation deference-worthy, we would have to conclude that Congress not only had hidden a rather large elephant in a rather obscure mousehole, but had buried the ambiguity in which the pachyderm lurks beneath

an incredibly deep mound of specificity, none of which bears the footprints of the beast or any indication that Congress even suspected its presence. We therefore seriously doubt that Congress intended to empower the Commission to undertake that regulation, and we are reluctant to even afford the regulation the deference due agency action that survives the analysis at the first step of *Chevron*. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160-61 (2000).

By way of comparison, in *California Independent System Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004) ("*CAISO*"), we reviewed an order of the Federal Energy Regulatory Commission ("FERC") purporting to replace the governing board of a nonprofit, "public benefit" corporation created by the State of California pursuant to statutes of that state. FERC claimed *Chevron* deference for its action, pointing specifically to the language of 16 U.S.C. § 824e(a), which empowered FERC, upon a finding that "any rule, regulation, practice, or contract affecting [a] rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential," to "determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force . . . ." FERC construed the word "practice" to be sufficiently ambiguous to allow it, under the deferential formula of *Chevron*, to set aside and replace the state-imposed method for selecting the corporation's board.

On review, we noted that the sort of ambiguity giving rise to *Chevron* deference "'is a creature not of definitional possibilities, but of statutory context.'" 372 F.3d at 400 (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). In granting review and setting aside the FERC order, we concluded, *inter alia*, that the intent of Congress in the statutory section before us was "actually quite plain: the grant of authority to regulate rates, charges, classifications, and closely

related matters." *Id.* We further concluded that it was "quite a leap to move" from the context of transactional terms used in the statute to an implication that, by the ambiguity inherent in the word "practice," Congress intended to grant to the Commission not merely the power "to effect a reformation of some 'practice' in a more traditional sense," but also "to reform completely the governing structure of the utility . . . ." *Id.*

We further held that such an extraordinary construction of "practice" in such a discrete regulatory context was a "sufficiently poor fit with the apparent meaning of the statute that the statute is not ambiguous on the very question before us," as would be necessary to afford *Chevron* deference at the first step of the two-step inquiry. *Id.* at 401.

We were instructed in our *CAISO* reasoning by the Supreme Court's decision in *Brown v. Gardner*, 513 U.S. 115 (1994). In *Gardner*, the Court considered an interpretation by the Veterans Administration of statutory language requiring the VA to compensate for "an injury, or an aggravation of an injury," that occurs "as a result of" VA treatment. 38 U.S.C. § 1151(a) (1994) (amended 1996). The Veterans Administration, in 38 C.F.R. § 3.358(c)(3), interpreted the compensation requirement as covering an injury only if it resulted from negligent treatment by the VA or an accident occurring during treatment. The lower courts held that the statute imposed no such fault-or-accident requirement and found the regulation invalid. The Supreme Court affirmed and, in language followed by us in *CAISO*, noted the "poor fit of this language with any implicit requirement of VA fault . . . ." 513 U.S. at 120. We find a similarly poor fit between the statutory language and the Commission's interpretation in this case.

Lest it be forgotten, the basic language in which the Commission finds the ambiguity permitting it to regulate the

practice of law is that of § 6805 empowering the Federal Trade Commission and other "federal functional regulators" to enforce the statute and regulations prescribed under it with respect to "financial institutions and other persons subject to [the Commission's] jurisdiction . . . ." 15 U.S.C. § 6805(a). That language, even with–perhaps especially with–the layers of incorporated statutory and regulatory language describing financial institutions makes an exceptionally poor fit with the FTC's apparent decision that Congress, after centuries of not doing so, has suddenly decided to regulate the practice of law. This fit is helped but little, if at all, by the congressional definition of "financial institution" as "an institution the business of which is engaging in financial activity." 15 U.S.C. § 6809(3)(A). An attorney, or even a law firm, does not fit very neatly into the niche of a "financial institution." Even if one concedes–and it is quite a concession–that Congress would have intended the word "institution" to include an attorney, or even a law firm, it still requires quite a stretch to conclude that such an institution is a "financial institution." It trims the stretch little, if at all, to read the entire statutory definition of "financial institution" as "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12" (set forth above). Without reiterating the language of the incorporated statute, attorneys and law firms, even if viewed as "institutions," are not institutions "the business of which is engaging in financial activities," as defined in the statute. The Commission itself seems to recognize the improbability of Congress's having intended to include law firms within the designation "institutions" in the letter under review, in which it conspicuously substituted the word "entities" for "institutions." Such a dramatic rewriting of the statute is not mere interpretation. Even if we accept the inclusion of "entities" such as law firms within the meaning of "institutions," the "business" of a law firm (if the practice of a profession is properly viewed as business) is the practice of the profession of law.

The Commission distorts the definition slightly but improves the fit but little by its regulatory definition that a financial institution is "an institution that is significantly engaged in financial activities," as opposed to requiring that the institution must be one the business of which is engaging in financial activities. Building on this stretch, the Commission, in its brief, supplies reasoning conspicuously lacking from the letter of determination that we review. Although we cannot affirm an agency's actions based on the *post hoc* rationale of its litigating position, *see, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Insurance Co.*, 463 U.S. 29, 50 (1983), even if we charitably construe the letter to imply the reasoning, it is still inadequate.

The reasoning in the brief relies on the language of Regulation Y, the second tier incorporation. As noted above, Regulation Y, in its original application, described the "closely related nonbanking activities" in which a bank holding company or its subsidiaries might engage. Within that voluminous listing, the regulation included two activities, "[p]roviding real estate settlement services," and "[p]roviding tax-planning and tax-preparation services," in which attorneys sometimes, and apparently in the view of the Commission, *significantly* engage. *See* 16 C.F.R. § 313.3(k)(1). Again, if Congress intended to empower a federal financial regulator to undertake regulation of the practice of law, this seems a strangely unclear method of doing so. The statute after all defined a "financial institution" as "an institution the business of which is engaging in financial activities." Congress did not adopt the approach of the Commission by covering "an institution that is significantly engaged in financial activities." Certainly it did not extend that definition to cover all "entities." In sum, Congress did not leave an ambiguity on the question before us– that is, the power of the Commission to regulate the practice of law–sufficient to compel

deference to the Commission's determination to do so.[4]

We further determine that even if we err in our conclusion that the regulation fails at *Chevron* Step One, we are satisfied that the interpretation afforded by the Commission is not sufficiently reasonable to survive that deference at Step Two.

## B. *Chevron* Step Two

All the reasons set forth above for our determination that Congress did not intend to leave sufficient ambiguity to support deferential review return to convince us that the interpretation is not reasonable even if we afford it deference. But our analysis under *Chevron* Step Two need not end there. It is undisputed that the regulation of the practice of law is traditionally the province of the states. Federal law "may not be interpreted to reach into areas of State sovereignty unless the language of the federal law compels the intrusion." *City of Abilene v. FCC*, 164 F.3d 49, 52 (D.C. Cir. 1999). Otherwise put, "if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989) (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)). By now it should be abundantly plain that Congress has not made an intention to regulate the practice of law "unmistakably clear" in the language of the GLBA. In

---

[4]We note that the bar associations have preserved on appeal the additional argument that *Chevron* deference is unwarranted because "[i]nterpretations such as those in opinion letters," which were not arrived at by means of a formal adjudication or notice and comment rulemaking, "do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Given our disposition of the case, we need not address that argument.

*Gregory v. Ashcroft*, 501 U.S. 452 (1991), citing, *inter alia*, *Will* and *Atascadero State Hospital*, the Supreme Court held that

> [t]his plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere.

501 U.S. at 461.

The Commission contends that this plain statement rule of *Gregory* is not applicable, arguing that *Gregory*, which concerns a determination of qualification for state officials, involved a "decision of the most fundamental sort for a sovereign entity." *Id.* at 460. According to the Commission, the present regulation, "by contrast . . . regulates the conduct of private entities or individuals; there is no regulation of States or state officials." Reply Brief at 27. This response does not pass muster. *Gregory* itself quoted from *Will* the language in which the Supreme Court rejected an argument that the plain statement rule applied only in an Eleventh Amendment context. "'*Atascadero* was an Eleventh Amendment case, but a similar approach is applied in other contexts.'" *Gregory*, 501 U.S. at 461 (quoting *Will*, 491 U.S. at 65). We see no reason why the reasoning should not apply in the present context. The states have regulated the practice of law throughout the history of the country; the federal government has not. This is not to conclude that the federal government could not do so. We simply conclude that it is not reasonable for an agency to decide that Congress has chosen such a course of action in language that is, even charitably viewed, at most ambiguous.

Finally, the original context of the language of Regulation Y argues against the Commission's application in the present context. That regulation sets out the "[c]losely related

nonbanking activities," which "are *so closely related* to banking or managing or controlling banks as to be a proper incident thereto." (emphasis added). The effect of the regulation was to establish what activities "may be engaged in by a bank holding company or its subsidiary in accordance with the requirements of this regulation." Granted, banks and bank holding companies may at times engage in "providing real estate settlement services, and providing tax planning and tax preparation services." We know of no instance in which banks or bank holding companies have engaged in the practice of law. We know of no state in which state bar regulations would permit such practice. We know of no instances in which the Commission has approved a bank holding company owning a law firm as its subsidiary. We are not prepared to hold on the basis of the present record that it would be lawful for a bank or a bank holding company to do so; nonetheless, that result would seem to flow from the holding the Commission seeks to have us enter today. We cannot hold that an interpretation compelling that result is reasonable, even if the Commission's letter order survives *Chevron* Step One and earns deference.

## V. Conclusion

For the reasons set forth above, we hold that the Commission's interpretation is not entitled to *Chevron* deference. We further hold that, even if we afford the interpretation deference, the Commission's interpretation is not a reasonable one. We therefore conclude and hold that the judgment appealed from is affirmed.

*So ordered.*