Opinion for the Court filed by Circuit Judge BROWN.
Dissenting opinion by Senior Circuit Judge RANDOLPH.
BROWN, Circuit Judge:
Petitioners Hearth, Patio & Barbecue Association (“HPBA”) and National Propane Gas Association (“NPGA”) seek review of two recently promulgated rules that petitioners believe expanded the Energy Policy and Conservation Act (“EPCA”), 42 U.S.C. § 6201 et seq., to include decorative fireplaces.[1] Among other challenges, HPBA alleges the Department of Energy’s (“DOE”) interpretation of decorative fireplaces as “Direct heating equipment” (“DHE”), a specifically enumerated class of covered products under the Act, contravenes EPCA’s statutory scheme and, in turn, clear congressional intent. We agree. Finding no deference owed under Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we hold DOE’s feet to a not-so-decorative fire by vacating the rule in part and remanding.
I. Statutory Scheme
The EPCA authorizes DOE to promulgate “energy conservation standards,” 42 U.S.C. § 6291(6), for “covered products” provided that the standards are “techno *501 logically feasible,” “economically justified,” and result in “significant conservation of energy.” 42 U.S.C. § 6295(o). The EPCA initially recognized a total of fourteen classes of “covered products,” including “Home heating equipment, not including furnaces.” 42 U.S.C. § 6292(a)(7) (1987). In 1987, the National Appliance Energy Conservation Act (“NAECA”) amended the EPCA by, inter alia, expanding the number of “covered products” from fourteen to twenty and replacing the term “Home heating equipment, not including furnaces,” with “Direct heating equipment.” 42 U.S.C. § 6292(a)(9). Congress did not define either statutory phrase.
There are two types of covered products under this statutory scheme: nineteen specifically enumerated classes, 42 U.S.C. § 6292(a)(l)-(19), including DHE, and a catch-all class that includes “[a]ny other type of consumer product which [DOE] classifies as a covered product under subsection (b)." 42 U.S.C. § 6292(a)(20). To classify a consumer product as a covered product under the catch-all provision, DOE must show that (1) the classification was “necessary or appropriate” to carry out the chapter’s purpose, and (2) the “average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year.” 42 U.S.C. § 6292(b). But even if DOE satisfies this threshold jurisdictional test, it is not free to regulate newly classified covered products as it would one of the specifically enumerated covered products. To the contrary, DOE must make several showings before imposing energy standards for these products, including the aggregate household energy use by product type and the technological feasibility of substantial energy efficiency improvement. See 42 U.S.C. § 6295(0(1). The EPCA also bars the application of “[a]ny new or amended standard ... to products manufactured within five years after the publication of a final rule establishing such standard.” 42 U.S.C. § 6292(i )(2).
II. Rulemaking & Procedural History
For present purposes, it is enough to cut through the confused nomenclature and recognize the existence of two principal categories of heaters prior to the enactment of the NAECA in 1987: those which were purely functional, ie., room heaters, and .those which were purely decorative, ie., faux fireplaces. Decorative fireplaces mimic the aesthetic of a conventional fireplace with a log fire, but are specifically designed to minimize the amount of heat generated.[2]
Sometime after 1987, however, manufacturers began to introduce fireplace heaters — heaters designed for both utilitarian heating and general aesthetics. Fireplace heaters resemble traditional fireplaces but are “heater rated” insofar as they are tested and marketed on the basis of their “annual fuel utilization efficiency” (“AFUE”) ratings. Fireplace heaters, like decorative fireplaces, are classified as “vented gas hearth” appliances, which are also known as “vented hearth products” (“VHP”).
*502 The challenges in this case stem from two closely related rulemakings in which DOE defined both types of VHP — decorative fireplaces and fireplace heaters — as “Vented hearth heaters” (“VHH”). Because VHH are a subset of DHE, DOE’s rulemaking had the effect of subjecting both types of fireplaces to EPCA’s energy efficiency standards. DOE claims its interpretation of VHH to encompass decorative products is reasonable and thus entitled to deference. Petitioners respond that DOE’s dual rulemaking was a classic “bait-and-switch” designed to implement an interpretation that is unambiguously foreclosed by the statutory authority. To make sense of these arguments, we must turn to the rulemaking history. Here’s what happened.
In late 2006, DOE announced that it was considering a rulemaking to determine whether VHP could be regulated as vented heaters, a type of DHE.[3] Petitioners and other interested parties assumed DOE’s references to VHP included only fireplace heaters, not decorative fireplaces. The assumption was well-founded since DOE had consistently limited its discussion to those VHP with a utilitarian heating purpose. The Department’s December 2009 proposed rule bore this supposition out. It proposed a fourth subcategory of vented heaters called “Vented hearth heater” that would be subject to the industry’s fireplace heater standard, ANSI Z21.88. See Energy Conservation Program, 74 Fed.Reg. 65,852, 65,868 (Dec. 11, 2009). The proposed definition read:
Vented hearth heater means a vented, freestanding, recessed, zero clearance fireplace heater, a gas fireplace insert or a gas-stove, which simulates a solid fuel fireplace and is designed to furnish warm air, without ducts to the space in which it is installed.
Id. (emphasis added).
Any consensus between manufacturers and DOE as to the scope of the rulemaking would, however, prove short lived. DOE abruptly reversed position in its Final Rule, sweeping both decorative fireplaces and decorative heaters into the definition of VHH. See Energy Conservation Program, 75 Fed.Reg. 20,112, 20,128-30 (Apr. 16, 2010). To do this, DOE excised the term “fireplace heater” from the proposed definition of VHH and interpreted the phrase “designed to furnish warm air” to include decorative fireplaces. Id. at 20,234. DOE reasoned that “all hearth products create heat and nearly all ... provide some amount of [ ] heat, however small that may be, to the surrounding living space.” Id. at 20,129.
Because decorative products are designed to stay cool and look pretty — not efficiently convert energy to heat — their manufacturers would most certainly struggle to comply with the EPCA since the Act’s AFUE-based energy efficiency standards had been designed with traditional DHE products in mind. Likely recognizing as much, DOE included a safe harbor: any device with a “maximum input capacity” of less than 9,000 Btu/h would be deemed decorative and thus exempted from having to comply with DHE efficiency standards. See id. at 20,234.
After petitioner HPBA challenged the 2010 Final Rule in two cases later consolidated before this Court, see Case Nos. 10-1113 and 10-1181, DOE issued a notice of proposed rulemaking. Energy Conservation Program, 76 Fed.Reg. 43,941 (July 22, *503 2011). The Final Rule issued approximately four months later. Energy Conservation Program, 76 Fed.Reg. 71,836 (Nov. 18, 2011) (“2011 Final Rule”). DOE’s 2011 rulemaking did two things of relevance. First, it doubled down on its expansion of VHH’s definition by clarifying its belief “that all vented hearth products ... are designed to furnish heat, regardless of whether they have a mechanical means for furnishing the air (such as a blower) or grills.” 2011 Final Rule at 71,839. Second, DOE modified the VHH safe harbor exemption by dropping the onerous 9,000 Btu/h maximum input capacity requirement in favor of a set of four specific criterion. Id. at 71,837.
Both petitioners challenged the 2011 Final Rule. See Case Nos. 12-1010 and 12-1014.[4]
III. Analysis
A.
The question is a familiar one: is Chevron deference owed? We conclude it is not.
For all the confusion in application, the Chevron two-step is old hat: “Pursuant to Chevron Step One, if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent. If Congress has not directly addressed the precise question at issue, the reviewing court proceeds to Chevron Step Two.” Petit v. U.S. Dep’t. of Educ., 675 F.3d 769, 778 (D.C.Cir.2012) (internal quotation marks omitted).
“Under Chevron Step One, we always first examine the statute de novo, employing traditional tools of statutory construetion.” Nat’l. Ass’n. of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C.Cir. 2007). The Court is thus free to consider “the text, structure, purpose, and history of an agency’s authorizing statute to determine whether a statutory provision admits of congressional intent on the precise question at issue.” Petit, 675 F.3d at 781. Here, the question is simply this: can DOE interpret “Direct heating equipment” to encompass purely decorative fireplaces? Because we find clear congressional intent to the contrary, we answer in the negative and decline to reach Chevron Step Two.
We begin as always with the relevant statutory text: “Direct heating equipment.” See Nat’l Petrochem. & Refiners Ass’n. v. EPA, 630 F.3d 145, 152 (D.C.Cir. 2010). Though ambiguity may yet lurk, plainly these are not vacuous words. When “direct,” a term ordinarily understood as that which is “[sjtraight,” “undeviating in course,” and “not circuitous or crooked,” is read together with “heating,” that which “heats or makes hot, in various senses,” a functional purpose emerges.[5] The first word distinguishes devices whose output must be routed in some way and the second supplies the output: heat, or warmth. To read both terms as modifying “equipment,” the “manner in which a person or thing is equipped,” strengthens the phrase’s instrumental and utilitarian gloss since the construction strongly suggests that the device in question is one designed to deliver heat to its immediate surroundings. In the same vein, consider the following sentence: “Mary Ann called the contractor to fix the heating and air conditioning.” It is generally understood that as a noun, “heating” refers to a system *504 designed to furnish heat into a living space.[6] It is for this reason that we understand the phrase “heating duct” to refer to a part of a building’s heating system, not a duct that produces its own ambient heat.
In the end, however, we cannot say that this language establishes unambiguous intent at Chevron Step One. It is a close question, to be sure, but Congress’s refusal to define “Direct heating equipment” or qualify the term in a clear manner to apply only to functional products leaves a residuum of definitional uncertainty sufficient to establish ambiguity. Cf. Friends of the Earth v. EPA, 446 F.3d 140, 142-44 (D.C.Cir.2006) (finding Congress’s purposeful use of “daily” to modify “total maximum loads” unambiguously foreclosed a measure of time other than daily).
But our inquiry does not end with the plain language. “[T]he sort of ambiguity giving rise to Chevron deference is a creature not of definitional possibilities, but of statutory context.” ABA v. FTC, 430 F.3d 457, 469 (D.C.Cir.2005); see also Cnty. of L.A. v. Shalala, 192 F.3d 1005, 1014 (D.C.Cir.1999) (“[T]o prevent statutory interpretation from degenerating into an exercise in solipsism, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law. Under Chevron step one we consider not only the language of the particular statutory provision under scrutiny, but also the structure and context of the statutory scheme of which it is a part.”); Petit, 675 F.3d at 781-82 (same). As we explained in ABA “the existence of ambiguity is not enough per se to warrant deference to the agency’s interpretation. The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity. Mere ambiguity in a statute is not evidence of congressional delegation of authority.” ABA 430 F.3d at 469; see also Sea-Land Serv., Inc. v. Dep’t of Transp., 137 F.3d 640, 645 (D.C.Cir.1998) 0Chevron “deference comes into play ... only as a consequence of statutory ambiguity, and then only if the reviewing court finds an implicit delegation of authority to the agency”). Accordingly, we turn our attention to the statute as a whole and ask whether it evinces a congressional desire to defer to DOE’s interpretation of DHE to encompass purely decorative fireplaces. We conclude it does not.
Congress prescribed the specific means by which the Department must regulate new consumer products not specifically enumerated in the EPCA. Pursuant to 42 U.S.C. § 6292(b), DOE must make two initial factual determinations before classifying the new consumer product as a “covered product” under 42 U.S.C. § 6292(a)(20). Only then will DOE have jurisdiction to regulate it. Thereafter, DOE must prescribe energy standards in accordance with the supplemental requirements of 42 U.S.C. § 6295(l), including a five-year moratorium on any new or amended standards. 42 U.S.C. § 6295(Z)(2).
When Congress speaks with such inimitable clarity, this Court must listen. The carefully drafted scheme we now confront reflects a considered balancing of competing concerns. On one hand, Congress recognized the importance of flexibility to a functioning administrative scheme. In support of that cause, it authorized DOE to not only amend the substance of the regulations, see 42 U.S.C. § 6295(e)(4)(A), *505 but to expand its regulatory scope as well, see 42 U.S.C. § 6292(a)(20). On the other, Congress understood that if left unchecked, DOE would expand its power in a manner contrary to what the legislature intended in enacting the EPCA. To combat this, Congress inserted threshold jurisdictional requirements, see 42 U.S.C. § 6292(b), and discrete substantive limits, see 42 U.S.C. § 6295(Z), that would curtail the way in which DOE could regulate consumer goods not previously classified as “covered.” In essence, Congress designed this statutory scheme to protect a defined class: manufacturers of products not specifically enumerated in the EPCA.
Decorative fireplaces clearly fall within this protected class. Until DOE codified its labored interpretation of “Direct heating equipment,” decorative fireplaces had never been regulated under the EPCA. This was not an oversight. Congress was well aware of decorative fireplaces but thought it unnecessary to subject manufacturers to the costs and burdens of government regulations. Congress has done nothing in the roughly four decades since enacting the EPCA to suggest any deviation from that view. Indeed, Congress had multiple opportunities to amend the legislation and bring decorative fireplaces within the regulatory fold but consistently declined to do so. This was a conscious choice.
As the NAECA amendment made clear, Congress revisits the EPCA with purpose, taking to the statutory scheme a scalpel, not a cudgel. Among other carefully crafted changes, Congress in 1987 enumerated entire new classes of covered products, including “Pool heaters,” 42 U.S.C. § 6292(a)(ll), and clarified others. Had Congress wished to regulate decorative fireplaces, it would have. Much in the same way, had Congress agreed with DOE that specifically enumerated covered product classes were flexible concepts that could be stretched broadly, presumably it would have regulated “Pool heaters” as a subset of “Water heaters,” 42 U.S.C. § 6292(a)(4), rather than naming it a distinct covered product class. 42 U.S.C. § 6292(a)(ll).
Furthermore, to the extent Congress replaced “not including furnaces,” a clumsily worded statutory phrase, with “Direct,” it maintained its juxtaposition between furnaces (devices that provide indirect heat through ductwork) and DHE (devices that provide direct heat to their immediate surroundings). This clarification reinforces Congress’s understanding that “Direct” has a functional meaning. Relatedly, Congress made a conscious choice to define— and continue to define — the energy efficiency of DHE and furnaces in terms of “annual fuel utilization efficiency.” 42 U.S.C. § 6291(22)(A). DOE explains on its website that AFUE is “a measure of how efficient the appliance is in converting the energy in its fuel to heat over the course of a typical year.” Furnaces and Boilers, Department of Energy, available at http://energy.gov/energysaver/articles/ furnaces-and-boilers (emphasis added). But as petitioners point out, the “ ‘efficiency’ of a product can be determined only by reference to the purpose it serves,” Pet. Br. at 34, and that purpose is obvious even by DOE’s own admission: heating living spaces.[7] Decorative fireplaces, of course, were not designed to heat rooms — never mind heat them efficiently. Surely Congress did not intend such incongruity. See API v. EPA, 198 F.3d 275, 278 (D.C.Cir. 2000) (“if Congress makes an explicit pro *506 vision for apples, oranges and bananas, it is most unlikely to have meant grapefruit”).
DOE has no effective retort to the thrust of these arguments. The 2010 and 2011 Final Rules contain not a single reference to 42 U.S.C. §§ 6292(a)(20), 6292(b), or 6295(Z). Equally telling, petitioners’ charge that “DOE unlawfully circumvented the statutory mechanism for identifying new ‘covered products’ by using its VHH definition to add decorative products to a statutory category of ‘covered products’ that does not include them,” Pet. Br. at 24, goes unanswered in the government’s brief. DOE has simply failed to offer a single justification or explanation as to why these statutory mandates would not apply here.[8]
DOE’s contrived effort to regulate decorative fireplaces as “Direct heating equipment” thus circumvented the plain language of the EPCA. DOE was free to grow its regulatory authority through the statutorily provided for means, but chose instead to push the outermost limits of interpretive credulity. Whether a conscious decision or not, this plainly contravenes congressional intent as manifested in a methodically drafted — and amended— statutory scheme. Consequently, we hold that Congress has “spoke[n] to the precise question at issue,” Am. Petroleum Inst., 198 F.3d at 278, and DOE’s interpretation to the contrary must fail at Chevron Step One. Government regulators simply cannot choose to ignore statutory limits on their authority and expect deference to come of their intransigence. See, e.g., Whitman v. Am. Trucking Ass’ns., 531 U.S. 457, 484, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (gaps in Subpart 2 “cannot be thought to render Subpart 2’s carefully designed restrictions on EPA discretion utterly nugatory once a new standard has been promulgated”); NRDC v. EPA, 489 F.3d 1364, 1372 (D.C.Cir.2007) (“That EPA may have broad subcategorization authority, however, does not authorize EPA to sidestep what Congress has plainly prohibited.”).
Although decided outside the Chevron context, our decision in Colorado Indian Tribes v. National Indian Gaming Commission, 466 F.3d 134 (D.C.Cir.2006), is informative. The Indian Gaming Regulatory Act established three distinct classes of gaming. The Act charged the National Indian Gaming Commission (“Commission”) with oversight of class II gaming, id. at 137, but “contemplate^] joint tribal-state regulation” of class III gaming, id. at 138. The Commission eschewed the stat *507 ute’s straightforward scheme and promulgated rules establishing mandatory operating procedures for class III gaming. In support of its regulatory bravado, the Commission argued oversight was necessary to assure the integrity of outside audits required of tribes engaged in class II and III gaming, id. at 139, and, more broadly, that their authority to implement the Act as a whole required as much, id.
We rejected these arguments (and others) out of hand. Recognizing that “[a]ll questions of government are ultimately questions of ends and means,” id., we concluded that government agencies are “bound[] not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.” Id. at 139-40 (citing MCI Telecomms. Corp. v. AT & T, 512 U.S. 218, 231 n. 4, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994)). Congress may well have desired to “ensure the integrity of Indian gaming, but it is equally clear that Congress wanted to do this in a particular way.” Id. at 140. And so it is here as well. With comparable clarity, Congress employed specific statutory mechanisms to circumscribe DOE’s authority to define and regulate new consumer products under the EPCA. DOE cannot now escape these limits through its “linguistic jujitsu.” Sherley v. Sebelius, 644 F.3d 388, 399 (D.C.Cir.2011)

. As used in this opinion, “decorative fireplace” includes “gas logs,” a similarly situated device which the Department of Energy also defined as "Direct heating equipment.” See Energy Conservation Program, 76 Fed. Reg. 71,836, 71,837 (Nov. 18, 2011).

. Petitioners submitted nine affidavits explaining, among other things, how decorative fireplaces differ from functional heaters. Some models, for example, are designed to "vent most of the heat they generate outdoors” and not, like functional heaters, into the home. See Belding Aff. at 3, Hearth, Patio & Barbeque Ass'n., No. 12-1010 (D.D.C. Feb 8, 2012). Because they were "not intended to be heat efficient,” it is "unlikely that these products could be redesigned to meet the heating efficiency standards ... and it makes no sense to try: the basic design of these products is inherently unsuitable for an efficient heating appliance.” Id.

. See Rulemaking Framework for Residential Water Heaters, Direct Heating Equipment, and Pool Heaters, U.S. Department of Energy at 10-11 (Sept. 27, 2006), available at http:// www 1. eere. energy. gov/buildings/appliance_ standards/residential/pdfs/heating_ eqmpmenLffamework_092706.pdf.

. HPBA's challenges to the 2010 Final Rule have been held in abeyance since January, 2012. See Case No. 10-1113, Doc. No. 1355446 (D.C.Cir. Jan. 30, 2012) (per curiam). All four cases have been consolidated and are now before the Court.

. Definitions taken from The Oxford English Dictionary unless otherwise noted.

. See Heating, Cambridge Academic Content Dictionary, available at http://dictionary. cambridge.org/dictionary/american-english/ heating (“the process of making something warm, esp. a building, or the equipment used for this”).

. See 10 C.F.R. Part 430, Subpart B, Appendix O (test to calculate AFUE for DHE includes variables such as "average indoor temperature,” "average number of heating degree days,” “average length of the heating season,” etc.).

. DOE's implicit argument that the limiting provisions are not implicated because decorative fireplaces are properly classified as "Direct heating equipment” must fail as both circular and self-serving. It requires that the Court put the cart before the proverbial horse and assume DOE properly interpreted the statute. Such deference is wholly inappropriate where it provides a backdoor for a government regulator to circumvent the limits on its authority. We leave for another day — and other facts — the question of how to treat an agency’s proffered, non-circular justification for why its rulemaking did not implicate these statutory requirements. But we note without deciding that DOE may not be without interpretive authority under the EPCA. DOE might, for example, expand specifically enumerated covered product classes to include reasonably analogous products only recently introduced to the market. In this view, DOE could define DHE to encompass fireplace heaters without first classifying fireplace heaters as a new covered product. A relatively recent invention, fireplace heaters effectively post-date the NAECA, are functional in design, and their manufacturers have long subjected them to AFUE standards and testing. They simply do not pose the same questions and concerns as does the regulation of decorative products. Even petitioners concede as much in supporting the application of the rulemaking to fireplace heaters.