# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 8, 2006　　　　Decided October 20, 2006

No. 05-5402

COLORADO RIVER INDIAN TRIBES, A FEDERALLY RECOGNIZED
INDIAN TRIBE,
APPELLEE

v.

NATIONAL INDIAN GAMING COMMISSION, ET AL.,
APPELLANTS

---

Appeal from the United States District Court
for the District of Columbia
(No. 04cv00010)

---

*Todd S. Aagaard*, Attorney, U.S. Department of Justice,
argued the cause and filed the briefs for federal appellants.
*Edward J. Passarelli*, Attorney, U.S. Department of Justice,
entered an appearance.

*Gwenellen P. Janov* argued the cause for appellee. With her
on the brief were *Samuel D. Gollis* and *Kim Hoyt Sperduto*.

*Thomas M. Brownell* and *Scott D. Crowell* were on the brief
for *amici curiae* National Indian Gaming Association, et al. in
support of appellee.

Before: RANDOLPH and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: This is an appeal from an order of the district court, Bates, J., granting summary judgment in favor of the Colorado River Indian Tribes and against the National Indian Gaming Commission, the Commission's Chairman, and two of its members. *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 383 F. Supp. 2d 123 (D.D.C. 2005). The issue is whether the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, gives the Commission authority to promulgate regulations establishing mandatory operating procedures for certain kinds of gambling in tribal casinos.

Congress enacted the Indian Gaming Regulatory Act in the wake of the Supreme Court's decision that state gaming laws could not be enforced on Indian reservations within states otherwise permitting gaming, *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). The Act established the Commission as an agency within the Department of the Interior. 25 U.S.C. § 2704(a). The Commission has the authority to investigate and audit certain types of Indian gaming, to enforce the collection of civil fines, and to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions" of the Act. *Id.* § 2706; *see Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n*, 14 F.3d 633, 634 (D.C. Cir. 1994).

The Tribe operates the BlueWater Resort and Casino on Indian lands in Parker, Arizona. The casino offers what the Act defines as "class II" and "class III" gaming. Class II gaming includes bingo; "non-banking" card games; and pull-tabs, lotto, and other games similar to bingo, if played in the same location.

25 U.S.C. § 2703(7)(A), (B). Class III gaming includes most conventional forms of casino gaming such as slot machines, roulette, and blackjack. *Id*. § 2703(8); 25 C.F.R. § 502.4. Class I gaming consists of social gaming for minimal prizes and traditional forms of Indian gaming in connection with tribal ceremonies. 25 U.S.C. § 2703(6).

The Act treats each gaming class differently. "Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes," and is not subject to the Act. *Id*. § 2710(a)(1). As to class II gaming, the Commission and the tribes share regulatory authority: the tribes must enact a gaming ordinance applying the Act's minimum regulatory requirements; and the Commission's Chairman must approve the tribal ordinance before gaming may occur. *Id*. § 2710(a)(2), (b). The Act regulates how tribes engaging in class II gaming may make payments to tribal members, *id*. § 2710(b)(3), and it requires an annual outside audit of the gaming and various contracts, *id*. § 2710(b)(2)(C), (D).

Like class II gaming, class III gaming is lawful only if it takes place on Indian land "in a State that permits such gaming for any purpose by any person, organization, or entity . . .." *Id*. § 2710(d)(1)(B). But unlike class II gaming, a tribe conducts class III gaming pursuant to a compact with the state. *Id*. § 2710(d)(1)(C). The Secretary of the Interior must approve any such compact before it may become effective. *Id*. § 2710(d)(3)(B). Thereafter, the "Tribal-State compact govern[s] the conduct of gaming activities," *id*. § 2710(d)(3)(A), and the tribe's class III gaming operations must be "conducted in conformance" with the compact, *id*. § 2710(d)(1)(C). Tribal-state compacts may contain provisions related to "standards for the operation of such activity" and "any other subjects that are directly related to the operation of gaming activities." *Id*. § 2710(d)(3)(C)(vi), (vii). The Commission must approve any

tribal ordinances for regulating and conducting class III gaming and any contracts the tribe enters into for the management of its class III gaming. *Id*. § 2710(d)(1)(A)(iii), (d)(9).

The Colorado River Indian Tribes regulates gaming at its BlueWater casino pursuant to a tribal ordinance and rules contained in a tribal-state class III gaming compact with the State of Arizona. *See* Gaming Ordinance of the Colo. River Indian Tribes, Ord. No. 94-1 (Aug. 31, 1994); Colo. River Indian Tribes and State of Ariz. Gaming Compact (Jan. 31, 2003) (*Gaming Compact*). Both the ordinance and the compact contain their own internal control standards. The most recent version of the compact requires the Tribe's gaming agency to create standards governing operating procedures that are at least as stringent as those contained in the rules the Commission promulgated in 1999. *Gaming Compact* § 3(b)(3)(B). The State of Arizona monitors the Tribe's compliance with the standards, for which the Tribe reimburses the state about $250,000 per year. The Tribe's gaming agency employs twenty-nine employees and has an annual budget of $1.2 million.

In 1999 the Commission promulgated regulations, which it termed "Minimum Internal Control Standards," governing class II and class III gaming. *See* 64 Fed. Reg. 590 (Jan. 5, 1999) (codified as amended at 25 C.F.R. pt. 542). The regulations take up more than eighty pages in the Code of Federal Regulations. No operational detail is overlooked. The rules establish standards for individual games, *see, e.g.*, 25 C.F.R. § 542.7, .8, .10, customer credit, *id*. § 542.15, information technology, *id*. § 542.16, complimentary services, *id*. § 542.17, and many other aspects of gaming. To illustrate, tribes must establish "a reasonable time period" not to exceed seven days for removing playing cards from play, but "if a gaming operation uses plastic cards (not plastic-coated cards), the cards may be used for up to three (3) months if the plastic cards are routinely inspected, and

washed or cleaned in a manner and time frame approved by the Tribal gaming regulatory authority." *Id*. § 542.9(d), (e). To take another example the district court mentioned, coin drops are regulated differently according to the size of the gaming facility. *See id*. § 542.21, .31, .41. There are rules prescribing the number and type of employees who must be involved in the removal of the coin drop, *id*. § 542.21(g)(1), the timing of the removal of the coin drop, *id*. § 542.21(g)(2), the tagging and transportation of the coin drop, *id*. § 542.21(g)(4), the manner in which the coin drop must be housed while in the machine, *id*. § 542.21(g)(5), and the purposes for which a coin drop may be used, *id*. § 542.21(g)(6).

In January 2001, the Commission sought to audit the Tribe's class III gaming at the BlueWater casino in order to determine whether the Tribe was complying with the regulations. The Tribe protested on the ground that the rules exceeded the Commission's authority under the Act. The auditors departed and the Commission issued a notice of violation. After administrative hearings, the Commission fined the Tribe $2,000 for terminating the audit. *Colo. River*, 383 F. Supp. 2d at 130. The Commission denied the Tribe's objection, citing its authority to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions" of the Act, 25 U.S.C. § 2706(b)(10), among which is the provision stating that one of the Act's purposes is to protect the integrity of gaming revenue, *id*. § 2702. *In re Colo. River Indian Tribes*, NOV/CFA 01-01, 5-6 (Nat'l Indian Gaming Comm'n May 30, 2002) (*NIGC Final Order*). The Commission located its power to audit the casino in § 2706(b)(4), which authorizes the Commission to "audit all papers, books, and records respecting gross revenues of class II gaming conducted on Indian lands and any other matters necessary to carry out the duties of the Commission under this chapter . . .." *See NIGC Final Order* at 7. The Tribe brought an action in federal district

court challenging the decision and the Commission's statutory authority to regulate class III gaming. The district court reached the "inescapable conclusion" that Congress did not intend to give such broad authority to the Commission, and therefore vacated the Commission's decision and declared the regulations unlawful as applied to class III gaming. *Colo. River*, 383 F. Supp. 2d at 132.

There was a time when the Commission agreed with the district court's view of the Act. The first Chairman of the Commission notified the Inspector General of the Department of the Interior in 1993 that "the regulation of class III gaming was not assigned to the Commission but was left to the tribes and the states . . .." Memorandum from Anthony J. Hope, Chairman, Nat'l Indian Gaming Comm'n to the Assistant Inspector General for Audits, Dep't of the Interior 2 (Oct. 18, 1993). He explained that this was why the Commission had not imposed "gaming control standards" on class III gaming: "the Act assigns those responsibilities to the tribes and/or the states." *Id*. The Commission's Chairman took the same position when he testified before Congress the following year. *See Manner in which Gaming Activities Are Regulated by the Several States and the Role of the Federal Government in the Regulation of Indian Gaming Activities: Hearing Before the S. Comm. on Indian Affairs*, 103d Cong. 7-8 (1994) (testimony of Chairman Hope, Nat'l Indian Gaming Comm'n). Despite many legislative efforts since then, all of which are cited in Judge Bates's careful opinion, 383 F. Supp. 2d at 142 n.13, Congress has never amended the Act to confer any such express power on the Commission.

Even now the Commission concedes that no provision of the Act explicitly grants it the power to impose operational standards on class III gaming. Section 2706 grants the Commission authority over several aspects of class II regulation.

Thus, the Commission "shall monitor class II gaming," and "inspect and examine all premises located on Indian lands on which class II gaming is conducted . . .." 25 U.S.C. § 2706(b)(1), (2). It "may demand access to and inspect, examine, photocopy, and audit all papers, books, and records respecting gross revenues of class II gaming conducted on Indian lands and any other matters necessary to carry out the duties of the Commission under this chapter . . .." *Id.* § 2706(b)(4). While the statute grants the Commission audit authority over "any other matters necessary to carry out [its] duties," the statute does not indicate that these duties extend to class III regulation. Instead, the main provision dealing with the regulation of class III gaming – § 2710(d) – contemplates joint tribal-state regulation. The Act describes tribal-state compacts as agreements "governing the conduct of [class III] gaming activities." *Id.* § 2710(d)(3)(A). A compact may contain provisions relating to "the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of" class III gaming, *id.* § 2710(d)(3)(C)(i), "standards for the operation of such activity," *id.* § 2710(d)(3)(C)(vi), and "any other subjects that are directly related to the operation of [class III] gaming activities," *id.* § 2710(d)(3)(C)(vii). That the Act sets up concurrent tribal-state regulation of class III gaming, not tribal-state-Commission regulation, is evident from § 2710(d)(5): "Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with, or less stringent than" – not Commission regulations, but – "the State laws and regulations made applicable by any Tribal-State compact entered into by the Indian tribe under paragraph (3) that is in effect." Contrast this provision with § 542.4(c) of the regulations, which states that if a standard in the Commission's regulations is more stringent than a standard in a tribal-state

compact, the Commission's regulation "shall prevail." 25 C.F.R. § 542.4(c). There are other indications that Congress intended to leave the regulation of class III gaming to the tribes and the states, including the fact that the Secretary of the Interior – rather than the Commission – approves (or disapproves) tribal-state compacts regulating class III gaming. 25 U.S.C. § 2710(d)(3)(B). The significance of this provision and others is thoroughly discussed in Judge Bates's opinion in the district court, 383 F. Supp. 2d at 135-38, and need not be repeated here.

As against this, the Commission offers three main arguments. One is that the Commission has "oversight" authority over class III gaming, that the dictionary defines "oversight" to mean "supervision," and that the Commission's regulation of class III gaming falls within that definition. The trouble is that the Act does not use the word "oversight." The Commission relies not on statutory language, but on a sentence from the Senate committee report on the Act: "The Commission will have a regulatory role for class II gaming and an oversight role with respect to class III gaming." S. REP. NO. 100-446, at 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3071. But just two sentences before the "oversight" passage, the report states that the Senate bill "provides for a system for joint regulation by tribes and the Federal Government of class II gaming on Indian lands and a system for compacts between tribes and States for regulation of class III gaming." *Id.* One might wonder why the Committee would rely on tribal-state compacts to regulate class III gaming. The report gives this explanation: "the Committee notes that there is no adequate Federal regulatory system in place for class III gaming, nor do tribes have such systems for the regulation of class III gaming currently in place. Thus a logical choice is to make use of existing State regulatory systems, although the adoption of State law is not tantamount to an accession to State jurisdiction. The use of State regulatory systems can be accomplished through negotiated compacts but

this is not to say that tribal governments can have no role to play in regulation of class III gaming – many can and will." *Id*. at 13. In addition to the point that a committee report is not law, it is perfectly clear that whatever the Senate committee thought "oversight" might entail, the committee did not foresee the Commission regulating class III gaming.

The Commission's other arguments proceed from the text of the Act. The Commission is funded by a percentage of each tribe's gross gaming revenues from class II and class III gaming. 25 U.S.C. § 2717(a). To this end, tribes must submit annual "outside audits" to the Commission of their class II and class III gaming operations. *Id*. § 2710(b)(2)(C), (d)(1)(A)(ii). From this the Commission infers that it has the authority to regulate the handling and accounting of gaming receipts in order to ensure the integrity of audits. We cannot see how the right to receive an outside audit, presumably conducted in accordance with Generally Accepted Auditing Standards, translates into a power to control gaming operations. Under the Securities Exchange Act of 1934, public companies must file reports necessary to the protection of investors. *See* 15 U.S.C. § 78m(a). If the public company happened to be in the casino business, such as Harrah's Entertainment, Inc., the Commission's logic here would entitle the SEC to dictate the details of how Harrah's conducts its casino operations because the SEC receives reports from the company. The SEC obviously has no such authority, and neither does the Commission.

This brings us to the Commission's third argument – namely, that its regulations are valid in light of its authority to "promulgate such regulations and guidelines as it deems proper to implement the provisions of [the Act]." 25 U.S.C. § 2706(b)(10). *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356 (1973), the Commission tells us, states a canon of statutory interpretation for general rulemaking provisions such

as this – regulations promulgated pursuant to such statutes are valid so long as they are "reasonably related to the purposes of the enabling legislation." *Id*. at 369 (quoting *Thorpe v. Housing Auth. of Durham*, 393 U.S. 268, 280-81 (1969)). Judge Bates rejected this argument and so do we. An agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority. *See Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006). So here. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 92 (2002) ("Our previous decisions, *Mourning* included, do not authorize agencies to contravene Congress' will in this manner.").

In arguing that the regulations implement the provisions of the Act, the Commission points to § 2702, the Act's general declaration of policy, which it says embodies the congressional purpose to promote integrity in Indian gaming, a purpose the Commission's regulations further. But this cannot carry the Commission as far as it needs to go. We have observed before that "[a]ll questions of government are ultimately questions of ends and means." *Nat'l Fed'n of Fed. Employees v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993); *see Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.* 474 U.S. 361, 373-74 (1986). Agencies are therefore "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994). The Commission is correct that Congress wanted to ensure the integrity of Indian gaming, but it is equally clear that Congress wanted to do this in a particular way. The declared policy is therefore not simply to shield Indian tribes "from organized crime and other corrupting influences" and "to assure that gaming is conducted fairly and honestly by both the operator and players," 25 U.S.C. § 2702(2), but to accomplish this through the "statutory basis for the regulation of gaming"

provided in the Act, *id*. This leads us back to the opening question – what is the statutory basis empowering the Commission to regulate class III gaming operations? Finding none, we affirm.

*So ordered.*