# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 11, 2012       Decided February 8, 2013

No. 10-1113

HEARTH, PATIO & BARBECUE ASSOCIATION, ET AL.,
PETITIONERS

v.

UNITED STATES DEPARTMENT OF ENERGY,
RESPONDENT

NATURAL RESOURCES DEFENSE COUNCIL,
INTERVENOR

Consolidated with 10-1181, 12-1010, 12-1014

On Petitions for Review of Final Actions
of the Department of Energy

*Barton D. Day* argued the cause for petitioners. With him on the briefs were *John A. Hodges*, *Eric Andreas*, *Thomas R. McCarthy*, *William D. Blakely*, and *Lauren Desantis-Then*.

*H. Thomas Byron III*, Attorney, United States Department of Justice, argued the cause for respondent. With him on the brief were *Gregory H. Woods*, General Counsel, Department of Energy, *Daniel Cohen*, Assistant General

Counsel, *Eric Stas*, *Bettina Mumme*, Attorneys, *Stuart F. Delery*, Acting Assistant Attorney General, *Michael S. Rabb*, Attorney, United States Department of Justice.

*Timothy D. Ballo* was on the brief for intervenor Natural Resources Defense Council in support of respondent. With him were *Benjamin Longstreth* and *Katherine Kennedy*.

Before: HENDERSON and BROWN, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Dissenting opinion by *Senior Circuit Judge* RANDOLPH.

BROWN, *Circuit Judge*: Petitioners Hearth, Patio & Barbecue Association ("HPBA") and National Propane Gas Association ("NPGA") seek review of two recently promulgated rules that petitioners believe expanded the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201 et seq., to include decorative fireplaces.[1] Among other challenges, HPBA alleges the Department of Energy's ("DOE") interpretation of decorative fireplaces as "Direct heating equipment" ("DHE"), a specifically enumerated class of covered products under the Act, contravenes EPCA's statutory scheme and, in turn, clear congressional intent. We agree. Finding no deference owed under *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), we hold DOE's feet to a

---

[1]As used in this opinion, "decorative fireplace" includes "gas logs," a similarly situated device which the Department of Energy also defined as "Direct heating equipment." *See* Energy Conservation Program, 76 Fed. Reg. 71,836, 71,837 (Nov. 18, 2011).

not-so-decorative fire by vacating the rule in part and remanding.

## I. STATUTORY SCHEME

The EPCA authorizes DOE to promulgate "energy conservation standards," 42 U.S.C. § 6291(6), for "covered products" provided that the standards are "technologically feasible," "economically justified," and result in "significant conservation of energy." 42 U.S.C. § 6295(o). The EPCA initially recognized a total of fourteen classes of "covered products," including "Home heating equipment, not including furnaces." 42 U.S.C. § 6292(a)(7) (1987). In 1987, the National Appliance Energy Conservation Act ("NAECA") amended the EPCA by, *inter alia*, expanding the number of "covered products" from fourteen to twenty and replacing the term "Home heating equipment, not including furnaces," with "Direct heating equipment." 42 U.S.C. § 6292(a)(9). Congress did not define either statutory phrase.

There are two types of covered products under this statutory scheme: nineteen specifically enumerated classes, 42 U.S.C. § 6292(a)(1)-(19), including DHE, and a catch-all class that includes "[a]ny other type of consumer product which [DOE] classifies as a covered product under subsection (b)." 42 U.S.C. § 6292(a)(20). To classify a consumer product as a covered product under the catch-all provision, DOE must show that (1) the classification was "necessary or appropriate" to carry out the chapter's purpose, and (2) the "average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year." 42 U.S.C. § 6292(b). But even if DOE satisfies this threshold jurisdictional test, it is not free to regulate newly classified covered products as it would one of the specifically enumerated covered products. To the contrary, DOE must

make several showings before imposing energy standards for these products, including the aggregate household energy use by product type and the technological feasibility of substantial energy efficiency improvement. *See* 42 U.S.C. § 6295(*l*)(1). The EPCA also bars the application of "[a]ny new or amended standard . . . to products manufactured within five years after the publication of a final rule establishing such standard." 42 U.S.C. § 6292(*l*)(2).

## II. RULEMAKING & PROCEDURAL HISTORY

For present purposes, it is enough to cut through the confused nomenclature and recognize the existence of two principal categories of heaters prior to the enactment of the NAECA in 1987: those which were purely functional, *i.e.*, room heaters, and those which were purely decorative, *i.e.*, faux fireplaces. Decorative fireplaces mimic the aesthetic of a conventional fireplace with a log fire, but are specifically designed to *minimize* the amount of heat generated.[2]

Sometime after 1987, however, manufacturers began to introduce fireplace heaters — heaters designed for *both* utilitarian heating and general aesthetics. Fireplace heaters resemble traditional fireplaces but are "heater rated" insofar as they are tested and marketed on the basis of their "annual

---

[2] Petitioners submitted nine affidavits explaining, among other things, how decorative fireplaces differ from functional heaters. Some models, for example, are designed to "vent most of the heat they generate outdoors" and not, like functional heaters, into the home. *See* Belding Aff. at 3, *Hearth, Patio & Barbeque Ass'n*, No. 12-1010 (D.D.C. Feb 8, 2012). Because they were "not intended to be heat efficient," it is "unlikely that these products could be redesigned to meet the heating efficiency standards . . . and it makes no sense to try: the basic design of these products is inherently unsuitable for an efficient heating appliance." *Id.*

fuel utilization efficiency" ("AFUE") ratings. Fireplace heaters, like decorative fireplaces, are classified as "vented gas hearth" appliances, which are also known as "vented hearth products" ("VHP").

The challenges in this case stem from two closely related rulemakings in which DOE defined both types of VHP — decorative fireplaces and fireplace heaters — as "Vented hearth heaters" ("VHH"). Because VHH are a subset of DHE, DOE's rulemaking had the effect of subjecting both types of fireplaces to EPCA's energy efficiency standards. DOE claims its interpretation of VHH to encompass decorative products is reasonable and thus entitled to deference. Petitioners respond that DOE's dual rulemaking was a classic "bait-and-switch" designed to implement an interpretation that is unambiguously foreclosed by the statutory authority. To make sense of these arguments, we must turn to the rulemaking history. Here's what happened.

In late 2006, DOE announced that it was considering a rulemaking to determine whether VHP could be regulated as vented heaters, a type of DHE.[3] Petitioners and other interested parties assumed DOE's references to VHP included only fireplace heaters, not decorative fireplaces. The assumption was well-founded since DOE had consistently limited its discussion to those VHP with a utilitarian heating purpose. The Department's December 2009 proposed rule bore this supposition out. It proposed a fourth subcategory of vented heaters called "Vented hearth heater" that would be subject to the industry's fireplace heater standard, ANSI

---

[3] *See* Rulemaking Framework for Residential Water Heaters, Direct Heating Equipment, and Pool Heaters, U.S. Department of Energy at 10-11 (Sept. 27, 2006), *available at* http://www1.eere.energy.gov/buildings/appliance_standards/residen tial/pdfs/heating_equipment_framework_092706.pdf.

Z21.88.  *See* Energy Conservation Program, 74 Fed. Reg. 65,852, 65,868 (Dec. 11, 2009). The proposed definition read:

> *Vented hearth heater* means a vented, freestanding, recessed, zero clearance <u>fireplace heater</u>, a gas fireplace insert or a gas-stove, which simulates a solid fuel fireplace and is designed to furnish warm air, without ducts to the space in which it is installed.

*Id.* (emphasis added).

Any consensus between manufacturers and DOE as to the scope of the rulemaking would, however, prove short lived. DOE abruptly reversed position in its Final Rule, sweeping both decorative fireplaces and decorative heaters into the definition of VHH.  *See* Energy Conservation Program, 75 Fed. Reg. 20,112, 20,128–30 (Apr. 16, 2010). To do this, DOE excised the term "fireplace heater" from the proposed definition of VHH and interpreted the phrase "designed to furnish warm air" to include decorative fireplaces.  *Id.* at 20,234. DOE reasoned that "all hearth products create heat and nearly all . . . provide some amount of [] heat, however small that may be, to the surrounding living space."  *Id.* at 20,129.

Because decorative products are designed to stay cool and look pretty — not efficiently convert energy to heat — their manufacturers would most certainly struggle to comply with the EPCA since the Act's AFUE-based energy efficiency standards had been designed with traditional DHE products in mind.  Likely recognizing as much, DOE included a safe harbor: any device with a "maximum input capacity" of less than 9,000 Btu/h would be deemed decorative and thus exempted from having to comply with DHE efficiency standards. *See id.* at 20,234.

After petitioner HPBA challenged the 2010 Final Rule in two cases later consolidated before this Court, *see* Case Nos. 10-1113 and 10-1181, DOE issued a notice of proposed rulemaking. Energy Conservation Program, 76 Fed. Reg. 43,941 (July 22, 2011). The Final Rule issued approximately four months later. Energy Conservation Program, 76 Fed. Reg. 71,836 (Nov. 18, 2011) ("2011 Final Rule"). DOE's 2011 rulemaking did two things of relevance. First, it doubled down on its expansion of VHH's definition by clarifying its belief "that all vented hearth products . . . are designed to furnish heat, regardless of whether they have a mechanical means for furnishing the air (such as a blower) or grills." 2011 Final Rule at 71,839. Second, DOE modified the VHH safe harbor exemption by dropping the onerous 9,000 Btu/h maximum input capacity requirement in favor of a set of four specific criterion. *Id.* at 71,837.

Both petitioners challenged the 2011 Final Rule. *See* Case Nos. 12-1010 and 12-1014.[4]

### III. ANALYSIS

### A.

The question is a familiar one: is *Chevron* deference owed? We conclude it is not.

For all the confusion in application, the *Chevron* two-step is old hat: "Pursuant to *Chevron* Step One, if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent. If Congress has not directly

---

[4] HPBA's challenges to the 2010 Final Rule have been held in abeyance since January, 2012. *See* Case No. 10-1113, Doc. No. 1355446 (D.C. Cir. Jan. 30, 2012) (per curiam). All four cases have been consolidated and are now before the Court.

addressed the precise question at issue, the reviewing court proceeds to *Chevron* Step Two." *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 778 (D.C. Cir. 2012) (internal quotation marks omitted).

"Under *Chevron* Step One, we always first examine the statute *de novo*, employing traditional tools of statutory construction." *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007). The Court is thus free to consider "the text, structure, purpose, and history of an agency's authorizing statute to determine whether a statutory provision admits of congressional intent on the precise question at issue." *Petit*, 675 F.3d at 781. Here, the question is simply this: can DOE interpret "Direct heating equipment" to encompass purely decorative fireplaces? Because we find clear congressional intent to the contrary, we answer in the negative and decline to reach *Chevron* Step Two.

We begin as always with the relevant statutory text: "Direct heating equipment." *See Nat'l Petrochem. & Refiners Ass'n v. EPA*, 630 F.3d 145, 152 (D.C. Cir. 2010). Though ambiguity may yet lurk, plainly these are not vacuous words. When "direct," a term ordinarily understood as that which is "[s]traight," "undeviating in course," and "not circuitous or crooked," is read together with "heating," that which "heats or makes hot, in various senses," a functional purpose emerges.[5] The first word distinguishes devices whose output must be routed in some way and the second supplies the output: heat, or warmth. To read both terms as modifying "equipment," the "manner in which a person or thing is equipped," strengthens the phrase's instrumental and utilitarian gloss since the construction strongly suggests that the device in

---

[5] Definitions taken from The Oxford English Dictionary unless otherwise noted.

question is one *designed* to deliver heat to its immediate surroundings. In the same vein, consider the following sentence: "Mary Ann called the contractor to fix the heating and air conditioning." It is generally understood that as a noun, "heating" refers to a system designed to furnish heat into a living space.[6] It is for this reason that we understand the phrase "heating duct" to refer to a part of a building's heating system, not a duct that produces its own ambient heat.

In the end, however, we cannot say that this language establishes unambiguous intent at *Chevron* Step One. It is a close question, to be sure, but Congress's refusal to define "Direct heating equipment" or qualify the term in a clear manner to apply *only* to functional products leaves a residuum of definitional uncertainty sufficient to establish ambiguity. *Cf. Friends of the Earth v. EPA*, 446 F.3d 140, 142–44 (D.C. Cir 2006) (finding Congress's purposeful use of "daily" to modify "total maximum loads" unambiguously foreclosed a measure of time other than daily).

But our inquiry does not end with the plain language. "[T]he sort of ambiguity giving rise to *Chevron* deference is a creature not of definitional possibilities, but of statutory context." *ABA v. FTC*, 430 F.3d 457, 469 (D.C. Cir. 2005); *see also Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1014 (D.C. Cir. 1999) ("[T]o prevent statutory interpretation from degenerating into an exercise in solipsism, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law. Under *Chevron* step one we consider not only the language of the particular statutory

---

[6] *See Heating*, CAMBRIDGE ACADEMIC CONTENT DICTIONARY, *available at* http://dictionary.cambridge.org/dictionary/american-english/heating ("the process of making something warm, esp. a building, or the equipment used for this").

provision under scrutiny, but also the structure and context of the statutory scheme of which it is a part."); *Petit*, 675 F.3d at 781–82 (same). As we explained in *ABA*, "the existence of ambiguity is not enough per se to warrant deference to the agency's interpretation. The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity. Mere ambiguity in a statute is not evidence of congressional delegation of authority." *ABA*, 430 F.3d at 469; *see also Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998) (*Chevron* "deference comes into play . . . only as a consequence of statutory ambiguity, and then only if the reviewing court finds an implicit delegation of authority to the agency"). Accordingly, we turn our attention to the statute as a whole and ask whether it evinces a congressional desire to defer to DOE's interpretation of DHE to encompass purely decorative fireplaces. We conclude it does not.

Congress prescribed the specific means by which the Department must regulate new consumer products not specifically enumerated in the EPCA. Pursuant to 42 U.S.C. § 6292 (b), DOE must make two initial factual determinations before classifying the new consumer product as a "covered product" under 42 U.S.C. § 6292(a)(20). Only then will DOE have jurisdiction to regulate it. Thereafter, DOE must prescribe energy standards in accordance with the supplemental requirements of 42 U.S.C. § 6295(*l*), including a five-year moratorium on any new or amended standards. 42 U.S.C. § 6295(*l*)(2).

When Congress speaks with such inimitable clarity, this Court must listen. The carefully drafted scheme we now confront reflects a considered balancing of competing concerns. On one hand, Congress recognized the importance of flexibility to a functioning administrative scheme. In

support of that cause, it authorized DOE to not only amend the *substance* of the regulations, *see* 42 U.S.C. § 6295(e)(4)(A), but to expand its regulatory *scope* as well, *see* 42 U.S.C. § 6292(a)(20). On the other, Congress understood that if left unchecked, DOE would expand its power in a manner contrary to what the legislature intended in enacting the EPCA. To combat this, Congress inserted threshold jurisdictional requirements, *see* 42 U.S.C. § 6292(b), and discrete substantive limits, *see* 42 U.S.C. § 6295(*l*), that would curtail the way in which DOE could regulate consumer goods not previously classified as "covered." In essence, Congress designed this statutory scheme to protect a defined class: manufacturers of products not specifically enumerated in the EPCA.

Decorative fireplaces clearly fall within this protected class. Until DOE codified its labored interpretation of "Direct heating equipment," decorative fireplaces had *never* been regulated under the EPCA. This was not an oversight. Congress was well aware of decorative fireplaces but thought it unnecessary to subject manufacturers to the costs and burdens of government regulations. Congress has done nothing in the roughly four decades since enacting the EPCA to suggest any deviation from that view. Indeed, Congress had multiple opportunities to amend the legislation and bring decorative fireplaces within the regulatory fold but consistently declined to do so. This was a conscious choice.

As the NAECA amendment made clear, Congress revisits the EPCA with purpose, taking to the statutory scheme a scalpel, not a cudgel. Among other carefully crafted changes, Congress in 1987 enumerated entire new classes of covered products, including "Pool heaters," 42 U.S.C. § 6292(a)(11), and clarified others. Had Congress wished to regulate decorative fireplaces, it would have. Much in the same way,

had Congress agreed with DOE that specifically enumerated covered product classes were flexible concepts that could be stretched broadly, presumably it would have regulated "Pool heaters" as a subset of "Water heaters," 42 U.S.C. § 6292(a)(4), rather than naming it a distinct covered product class. 42 U.S.C. § 6292(a)(11).

Furthermore, to the extent Congress replaced "not including furnaces," a clumsily worded statutory phrase, with "Direct," it maintained its juxtaposition between furnaces (devices that provide *indirect* heat through ductwork) and DHE (devices that provide *direct* heat to their immediate surroundings). This clarification reinforces Congress's understanding that "Direct" has a functional meaning. Relatedly, Congress made a conscious choice to define — and continue to define — the energy efficiency of DHE and furnaces in terms of "annual fuel utilization efficiency." 42 U.S.C. § 6291(22)(A). DOE explains on its website that AFUE is "a measure of how *efficient* the appliance is in *converting the energy in its fuel to heat* over the course of a typical year." Furnaces and Boilers, Department of Energy, *available at* http://energy.gov/energysaver/articles/furnaces-and-boilers (emphasis added). But as petitioners point out, the " 'efficiency' of a product can be determined only by reference to the purpose it serves," Pet. Br. at 34, and that purpose is obvious even by DOE's own admission: heating living spaces.[7] Decorative fireplaces, of course, were not designed to heat rooms — never mind heat them *efficiently*. Surely Congress did not intend such incongruity. *See API v. EPA*, 198 F.3d 275, 278 (D.C. Cir. 2000) ("if Congress makes

---

[7] *See* 10 C.F.R. Part 430, Subpart B, Appendix O (test to calculate AFUE for DHE includes variables such as "average indoor temperature," "average number of heating degree days," "average length of the heating season," etc.).

an explicit provision for apples, oranges and bananas, it is most unlikely to have meant grapefruit").

DOE has no effective retort to the thrust of these arguments. The 2010 and 2011 Final Rules contain not a single reference to 42 U.S.C. §§ 6292(a)(20), 6292(b), or 6295(*l*). Equally telling, petitioners' charge that "DOE unlawfully circumvented the statutory mechanism for identifying new 'covered products' by using its VHH definition to add decorative products to a statutory category of 'covered products' that does not include them," Pet. Br. at 24, goes unanswered in the government's brief. DOE has simply failed to offer a single justification or explanation as to why these statutory mandates would not apply here.[8]

---

[8] DOE's implicit argument that the limiting provisions are not implicated because decorative fireplaces are properly classified as "Direct heating equipment" must fail as both circular and self-serving. It requires that the Court put the cart before the proverbial horse and assume DOE properly interpreted the statute. Such deference is wholly inappropriate where it provides a backdoor for a government regulator to circumvent the limits on its authority. We leave for another day — and other facts — the question of how to treat an agency's proffered, non-circular justification for why its rulemaking did not implicate these statutory requirements. But we note without deciding that DOE may not be without interpretive authority under the EPCA. DOE might, for example, expand specifically enumerated covered product classes to include reasonably analogous products only recently introduced to the market. In this view, DOE could define DHE to encompass fireplace heaters without first classifying fireplace heaters as a new covered product. A relatively recent invention, fireplace heaters effectively post-date the NAECA, are functional in design, and their manufacturers have long subjected them to AFUE standards and testing. They simply do not pose the same questions and concerns as does the regulation of decorative products. Even

DOE's contrived effort to regulate decorative fireplaces as "Direct heating equipment" thus circumvented the plain language of the EPCA. DOE was free to grow its regulatory authority through the statutorily provided for means, but chose instead to push the outermost limits of interpretive credulity. Whether a conscious decision or not, this plainly contravenes congressional intent as manifested in a methodically drafted — and amended — statutory scheme. Consequently, we hold that Congress has "spoke[n] to the precise question at issue," *Am. Petroleum Inst.*, 198 F.3d at 278, and DOE's interpretation to the contrary must fail at *Chevron* Step One. Government regulators simply cannot choose to ignore statutory limits on their authority and expect deference to come of their intransigence. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 484 (2001) (gaps in Subpart 2 "cannot be thought to render Subpart 2's carefully designed restrictions on EPA discretion utterly nugatory once a new standard has been promulgated"); *NRDC v. EPA*, 489 F.3d 1364, 1372 (D.C. Cir. 2007) ("That EPA may have broad subcategorization authority, however, does not authorize EPA to sidestep what Congress has plainly prohibited.").

Although decided outside the *Chevron* context, our decision in *Colorado Indian Tribes v. National Indian Gaming Commissions*, 466 F.3d 134 (D.C. Cir. 2006), is informative. The Indian Gaming Regulatory Act established three distinct classes of gaming. The Act charged the National Indian Gaming Commission ("Commission") with oversight of class II gaming, *id.* at 137, but "contemplate[d] joint tribal-state regulation" of class III gaming, *id.* at 138.

---

petitioners concede as much in supporting the application of the rulemaking to fireplace heaters.

The Commission eschewed the statute's straightforward scheme and promulgated rules establishing mandatory operating procedures for class III gaming. In support of its regulatory bravado, the Commission argued oversight was necessary to assure the integrity of outside audits required of tribes engaged in class II and III gaming, *id.* at 139, and, more broadly, that their authority to implement the Act as a whole required as much, *id.*

We rejected these arguments (and others) out of hand. Recognizing that "[a]ll questions of government are ultimately questions of ends and means," *id.*, we concluded that government agencies are "bound[] not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *Id.* at 139–40 (citing *MCI Telecomms. Corp. v. AT&T,* 512 U.S. 218, 231 n. 4 (1994)). Congress may well have desired to "ensure the integrity of Indian gaming, but it is equally clear that Congress wanted to do this in a particular way." *Id.* at 140. And so it is here as well. With comparable clarity, Congress employed specific statutory mechanisms to circumscribe DOE's authority to define and regulate new consumer products under the EPCA. DOE cannot now escape these limits through its "linguistic jujitsu." *Sherley v. Sebelius*, 644 F.3d 388, 399 (D.C. Cir. 2011) (Henderson, J., dissenting).

In sum, the language, context, and history of the EPCA make clear that DOE's "interpretation goes beyond the limits of what is ambiguous and contradicts what in our view is quite clear." *Whitman*, 531 U.S. at 481. Congress has established — and DOE simply chose to ignore — the means by which DOE could extend its regulatory authority. For these very same reasons, we would also reject DOE's interpretation at *Chevron* Step Two.

Because DOE's interpretation is not entitled to deference, we need not consider petitioners' related claims.

B.

The foregoing assumes that as a result of DOE's rulemaking, decorative fireplaces are now regulated as DHE under the EPCA. The dissent, however, has adopted DOE's untenable fiction that the agency "*did not in fact regulate purely decorative fireplaces.*" Dissent Op. at 1 (emphasis in original). Specifically, the dissent acknowledges that DOE included decorative fireplaces "in a broad definition" of DHE before "exempting them from the energy-conservation standards," but finds no "principled objection to this technique" since "[t]he end result is the same as if the rule first defined [DHE] to exclude decorative fireplaces." *Id.* at 4.[9] We very strongly disagree.

---

[9] Assuming *arguendo* the dissent is correct that DOE could effectuate the same ends without formally regulating decorative fireplaces, this is *not* what DOE did. The Department's 2011 Final Rule unequivocally stated:

DOE believes that regardless of whether the product is intended to provide only aesthetic appeal, by design, the product will generate heat due to the presence of the flame, and some of that heat will be transferred to the space. Indeed (as discussed further in section III), many interested parties have conceded that vented hearth products intended primarily for decorative use and vented gas log sets are an effective supplemental or emergency heat source, providing further justification for their inclusion as a type of covered direct heating equipment.

2011 Final Rule at. 71,839.

Even if we were to assume that there is no effective difference between defining DHE negatively to *exclude* decorative fireplaces or defining the safe harbor positively to *include* them, this higher order observation does not change what is clear on present facts: DOE stands in a position of control. With the foreknowledge that decorative fireplace manufacturers would have to comply or face onerous, potentially unreachable energy standards, DOE could at any time manipulate the safe harbor criterion to compel different or broader compliance. This is the essence of regulation. The petitioners and their four lawsuits — four more than necessary for "unregulated" parties — certainly agree.

More fundamentally, perhaps, we take issue with the dissent's suggestion that the specter of "regulation" somehow disappears because DOE can, without formally bringing decorative products into the regulatory fold, indirectly define that class of products by gerrymandering its definition of DHE. The means may change, but the *ultra vires* end remains the same. Agencies don't get a free pass simply because they've kept their definitional house in order. If faced with different facts, we suspect the dissent might agree.

Imagine DOE interpreted DHE to include the universe of what we would traditionally call hot tubs, but created a safe harbor in which any device that (1) held water and (2) had less than four water jets would be excluded as a "hot tub" from DHE's unattainable energy standards. Alternatively, imagine DOE defined DHE to include everything *except* devices that (1) hold water and (2) have less than four water jets. Under either approach, all water-holding tubs with four *or more* water jets — of which there are countless on the market — would be deemed subject to DHE requirements. Would we say then that hot tubs have escaped regulation? No,

certainly not. As a direct result of DOE's interpretive machinations, a sizeable number of what had long been regarded as hot tubs would now be regulated as DHE.[10] The only thing that escapes regulation is *what the agency has declared to be a hot tub*, regardless of whether or not it comports with the historical- or industry-based understandings of the term. And there's the hitch. With hot tubs as with decorative fireplaces, an agency supposedly without authority over that product class has not only altered and narrowed the accepted contours of that class, but holds the manufacturers hostage with the threat of future modifications.

True, this discrepancy might be more easily spotted in the hot tub hypothetical than here since decorative fireplaces are more closely related to traditional DHE, but the danger of such backdoor regulation is no less real. Consider the fourth safe harbor criterion, the requirement that products sold after January 1, 2015 must not include "a standing pilot light or other continuously-burning ignition source." 2011 Final Rule at 71,859. By DOE's admission, 38 percent of decorative fireplaces "would need to be redesigned to eliminate" these features. *Id.* at 71,849. Where more than a third of the products on the market would have to be reworked to comply with the safe harbor, it seems disingenuous to suggest DOE has not already altered the status quo.

Worse yet, to the extent manufacturers will have to redesign their products to function without standing pilot lights, DOE will have effectuated yet another workaround of

---

[10] Presumably, hot tub manufacturers would rush to redesign their products to comport with the four water jet maximum. Should DOE later reduce the figure to three — or add new requirements — the manufacturers would have no choice but to comply.

statutory limits. "Energy conservation standards" under the EPCA take two forms: performance standards that "prescribe[] a minimum level of energy efficiency or a maximum quantity of energy use," and design requirements. 42 U.S.C. § 6291(6). Whereas Congress authorized DOE to impose performance requirements on *all* covered products, it specifically limited its authority to impose design requirements to just a handful of product classes. *Id.* § 6291(6). Emphatically, DHE and the catch-all class, § 6292(a)(20), are *not* among them.

In response, DOE maintains in its briefing that the mere mention of an "energy-use characteristic[]," including standing pilot lights, will not "transform[] the definition into a design requirement." Resp't Br. at 44. But this is not what DOE argued in the 2011 Final Rule. Rather, DOE responded to the objection that the EPCA "does not provide DOE with the authority to impose design requirements," 2011 Final Rule at 71,847, by stating that it was "not mandating a design requirement for primarily decorative hearth products, because meeting the exclusion criteria is completely optional and at the manufacturers' discretion," *id*. Having conceded that the ban was a design requirement — though not a mandatory one — the agency's present argument is not an "amplified articulation" of its rulemaking position, *Local 814, Int'l Bhd. of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976), but an entirely unavailing *post hoc* rationalization. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

## IV. CONCLUSION

The dissent may well be correct that "the distance between two points on the vertical axis is the same whether one measures down or up," Dissent Op. at 4 (quotation marks

omitted), but it is likewise so that "a straight line is any distance between two places" and a circle but "a round straight line with a hole in the middle." Mark Twain, English as She Is Taught 15 (Mut. Book Co. 1900). Clearly the phrase "Vented hearth heater" did not encompass decorative fireplaces as that term is traditionally understood. In light of DOE's tightly limned regulatory circle, we vacate the entire statutory definition of "Vented hearth heater" and remand for DOE to interpret the challenged provisions consistent with this opinion. If the Department still wishes to regulate decorative fireplaces, it must do so through the EPCA's catch-all provision, § 6292(a)(20).

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, dissenting: The majority opinion holds that the Department of Energy, acting under the Energy Policy and Conservation Act, 42 U.S.C. §§ 6201 *et seq.*, exceeded its authority when it regulated "purely decorative fireplaces." *E.g.*, Maj. Op. 4, 8, 10.[1]

There is a fundamental problem with the majority's decision: *the Energy Department did not in fact regulate purely decorative fireplaces.* I do not like using italics for emphasis, but this deserves highlighting. This case is rather like an Escher drawing—once the viewer comes to realize that decorative fireplaces were indeed exempted from the government's regulating apparatus, it is difficult to see the case in any other light.

One must first consider what "regulating" means in this context. The rule we have before us is a definitional provision adopted in 2011.[2] I have included it in an addendum. It is but a tiny portion of 10 C.F.R. § 430.2. Part 430 is an imposing and cumbersome set of detailed regulations establishing energy-conservation standards for all manner of products under the Act. *See* 10 C.F.R. § 430.1. In terms of part 430, "regulating" means subjecting items—here decorative fireplaces—to energy-conservation standards. But "purely decorative" fireplaces, as the majority calls them, or "primarily decorative" fireplaces, as the Energy Department calls them in its brief and in the

---

[1] A decorative fireplace, according to the majority's nomenclature, includes gas fireplaces, gas fireplace inserts, gas stoves, and gas log sets that are "primarily decorative in nature." Energy Conservation Program, 76 Fed. Reg. 71,836, 71,837, 71,839 (Nov. 18, 2011).

[2] An earlier petition for judicial review of a 2010 rule, consolidated with this petition seeking review of the 2011 rule, is moot. The relevant portion of the 2010 rule has been superseded by the 2011 rule.

preamble to its rule (*e.g.*, Resp't Br. 3, 27; 76 Fed. Reg. at 71,842, 71,846), are exempt from energy-conservation standards. Reading the rule set forth in the addendum admits of no other conclusion.[3]

The Energy Department rule—unlike the majority opinion—describes a purely or primarily decorative fireplace with precision. Such products have four defining characteristics, each of which the Energy Department discussed in detail in the 2011 rulemaking. 76 Fed. Reg. at 71,846–49.

The first is that the product is "[c]ertified to ANSI Z21.50 . . . but not to ANSI Z21.88." 10 C.F.R. § 430.2 (vented hearth heater). Translated, "ANSI" means the American National Standards Institute, a standard-setting organization established in 1918 whose members include representatives of industry and government. Petitioners have no quarrel with this portion of the

---

[3] The Energy Department, in its brief and in oral argument, stressed again and again that it was not regulating purely or primarily decorative fireplaces. *See, e.g.*, Resp't Br. 37 ("The agency designed the final rule to *exclude* primarily decorative hearth heaters from the energy conservation standards applicable to hearth products that are primarily designed for utilitarian heating functions."); Oral Arg. Tr. 20:11–15 ("[T]he Government fundamentally agrees with Petitioners that decorative hearth products should not be subject[] to energy conservation standards. And indeed, the rule under review does not subject them to energy conservation standards."); *id.* at 42:12–13 ("They [decorative fireplaces] don't have to meet the standards of . . . efficiency that are set forth in the 2010 rule."); *id.* at 50:14–15 ("[T]he Agency hasn't sought to regulate these [decorative] products."); *id.* at 56:7–16 ("[N]obody wants to subject [decorative products] to energy conservation standards. Petitioners don't want that, the Agency doesn't want that, . . . we're not trying to do that. . . . So, we do try to carve out from the energy conservation standards those products that are decorative, principally decorative . . ..").

definition of decorative fireplace. How could they? It contains their industry's distinction between purely or primarily decorative fireplaces and those used for heating. *See* 76 Fed. Reg. at 71,846. Apparently the majority opinion finds this factor unobjectionable as well. It does not even mention it.

The second characteristic of a decorative fireplace is fairly straightforward. The product is sold without a thermostat, a device that "cycles the appliance on and off based on the temperature of the room." *Id.*[4] It is obvious why this is a defining feature of a purely decorative fireplace. Here again petitioners do not object to this part of the definition of a decorative fireplace. The majority opinion also says nothing about it.

The third defining characteristic also reflects common sense—the product must be "[e]xpressly and conspicuously identified on its rating plate and in all manufacturer's advertising and product literature" as a decorative product not to be used for heating. 10 C.F.R. § 430.2 (vented hearth heater). Again petitioners have nothing to say about this criterion and neither does the majority opinion.

The fourth and final defining characteristic is that the product does not have a standing pilot light (this applies only to products manufactured after July 1, 2015). Petitioners object to this criterion on the ground that it constitutes an impermissible design standard. Their argument is a strong one, and the majority seems to agree with them. To the extent that this fourth criterion is problematic, it seems to me that the appropriate

---

[4] The rule further requires that the product's warranty contain a provision "expressly voiding all manufacturer warranties in the event the product is used with a thermostat." 10 C.F.R. § 430.2 (vented hearth heater).

solution is simply to vacate it. The majority does not explain why that would not suffice.

To repeat, the Energy Department exempted primarily or purely decorative fireplaces from energy-conservation standards. It is true that it did this by including these products in a broad definition (of direct heating equipment) and then exempting them from the energy-conservation standards otherwise applicable to direct heating equipment. I see no principled objection to this regulatory technique, and the majority opinion offers none. The end result is the same as if the rule first defined direct heating equipment to exclude decorative fireplaces. "Even a beginner in mathematics knows that the distance between two points on the vertical axis is the same whether one measures down or up." Henry J. Friendly, *"Some Kind of Hearing,"* 123 U. PA. L. REV. 1267, 1295 (1975).

To this the majority responds that the Energy Department "could at any time manipulate the safe harbor criterion to compel different or broader compliance." Maj. Op. 17. That, according to the majority, is "the essence of regulation." *Id.* But the risk the majority identifies would exist even if the Energy Department had excluded decorative fireplaces from the definition of direct heating equipment. Whether decorative fireplaces are included in the definition of direct heating equipment and exempted from the otherwise-applicable energy-conservation standards or altogether excluded from the definition of direct heating equipment, there must still be a method—a set of criteria—for distinguishing primarily or purely decorative fireplaces from those used for heating. And in either case, those objecting to any future modifications to the criteria would be free to bring a new challenge.

The majority seems to assume that there is a "traditional understanding" of the term "decorative fireplace." *See* Maj.

Op. 20. But, except for objecting to the portion of the definition addressing standing pilot lights, the majority opinion never tells us how its version of a purely decorative fireplace differs from the Energy Department's definition. The majority identifies no problem with the first three criteria in that definition. Nor do petitioners. While petitioners suggest that certification to ANSI Z21.50 (the first criterion) should serve as the sole criterion for identifying decorative fireplaces, they object only to the "standing pilot light" (the fourth) criterion. But rather than simply vacating that fourth criterion, the majority has thrown the baby out with the bath water and set aside the entire definition of "vented hearth heater" (a category of direct heating equipment) in 10 C.F.R. § 430.2.

## ADDENDUM

Section 430.2 is amended by revising the definition for ''Vented hearth heater'' to read as follows:

### § 430.2 Definitions.

\* \* \* \* \*

*Vented hearth heater* means a vented appliance which simulates a solid fuel fireplace and is designed to furnish warm air, with or without duct connections, to the space in which it is installed. The circulation of heated room air may be by gravity or mechanical means. A vented hearth heater may be freestanding, recessed, zero clearance, or a gas fireplace insert or stove. The following products are not subject to the energy conservation standards for vented hearth heaters:

(1) Vented gas log sets and

(2) Vented gas hearth products that meet all of the following four criteria:

(i) Certified to ANSI Z21.50 (incorporated by reference; see § 430.3), but not to ANSI Z21.88 (incorporated by reference; see § 430.3);

(ii) Sold without a thermostat and with a warranty provision expressly voiding all manufacturer warranties in the event the product is used with a thermostat;

(iii) Expressly and conspicuously identified on its rating plate and in all manufacturer's advertising and product literature as a "Decorative Product: Not for use as a Heating Appliance"; and

(iv) With respect to products sold after January 1, 2015, not equipped with a standing pilot light or other continuously-burning ignition source.

Energy Conservation Program, 76 Fed. Reg. 71,836, 71,859 (Nov. 18, 2011).